**Affirmed as Modified in Part; Reversed in Part; Remanded; and Opinion filed September 11, 2014.**



In The

# Fourteenth Court of Appeals

NO. 14-12-00633-CV
NO. 14-12-00709-CV

**JERRY L. STARKEY, TBDL, L.P., AND PBW DEVELOPMENT CORPORATION, Appellants/Cross-Appellees**

**V.**

**GLEN GRAVES, Appellee/Cross-Appellant**

**On Appeal from the 405th District Court
Galveston County, Texas
Trial Court Cause No. 09-CV-0620**

## O P I N I O N

When the relationship between the companies and individuals involved in a limited partnership broke down, the aggrieved limited partner sued the other partners and their owner, alleging that they breached successive partnership agreements and committed or conspired to commit statutory and common-law

fraud and breaches of the duties of loyalty and care. The plaintiff sought the same two categories of actual damages for every theory of liability, and the jury assessed the same damages against at least one of the defendants under each cause of action submitted. On appeal, the liable defendants argue that the plaintiff cannot recover either category of damages, and that judgment cannot be supported under any theory of liability.

We affirm the award of actual damages under some of the jury findings but reverse the award of expert fees and deposition costs because no evidence supports the statutory-fraud finding. We remand the case for relitigation of attorney's fees. Because some of the jury's findings were made in response to erroneous questions in the charge, the plaintiff on remand may elect between (1) judgment based on the remaining favorable findings that were not successfully challenged in this appeal; or (2) a new trial of the claims asserted by or against the appellants, as explained below.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

Glen Graves owned a three-story retail-sales building in Galveston known as the Peanut Butter Warehouse, and he intended to add a fourth story, continue using the first floor for retail sales, and convert most of the remainder of the building to condominiums. After expending his own available funds and an additional $500,000 from a bank loan on the renovations, Graves needed more money to complete the work. He began discussions with potential investors.

Graves ultimately entered into multiple partnership agreements with appellant Jerry Starkey or with two of Starkey's companies—PBW Development

---

[1] Because the appellants challenge the legal sufficiency of the evidence to support certain findings, but none of the parties has briefed the factual sufficiency of the evidence, we summarize the relevant evidence in accordance with the legal-sufficiency standard of review.

2

Corporation ("the General Partner") and TBDL, L.P.  We refer to Starkey and the two companies collectively as "the Starkey parties."  Starkey is an attorney, a CPA, and the principal of a company that owns a parking lot near the building. Graves testified that Starkey was the attorney for all parties involved in the partnership, including Graves; Starkey testified that he was the attorney for all of those parties except Graves.  Starkey's wife Elizabeth is also a CPA and was the bookkeeper for the partnership, TBDL, and the General Partner.

Of the three partnership agreements alleged to have been executed—one in October 2006, one in January 2007, and one in April 2008—only the 2007 and 2008 agreements were produced at trial.[2]  Starkey testified that there was no 2006 agreement, and that Graves signed the 2007 and 2008 agreements.  Graves testified that he did not sign the 2007 agreement, and that Starkey must have attached the signature page from the 2006 agreement to the 2007 agreement, and then destroyed the 2006 agreement.  The jury was not asked to resolve this factual dispute. Instead, Graves ultimately asked the trial court to submit breach-of-contract questions to the jury about each of the three agreements, and the jury found that all three were breached.  We therefore refer to all three agreements as if each were executed by the parties.

A.    The October 2006 Agreement

The jury found that in October 2006, Starkey and Graves agreed to a written partnership agreement in which Starkey and Graves were "co-general partners." Graves was to contribute the building to the partnership, "oversee the project," and receive a gross salary of $1,500 per week, which is $78,000 per year.  Starkey was

---

[2] It is undisputed that PBW Development Corporation is the general partner under the 2007 and 2008 partnership agreements, so we refer to it as the "General Partner" as a matter of convenience.  There is no express finding that this company was a general partner in the remaining agreement, and it is unnecessary to imply such a finding.

3

to provide parking and "borrowing power with the banks for necessary loans." Through the General Partner and TBDL, Starkey also was to invest $500,000 in the project. The trial court incorporated these findings in the judgment.

As for the performance of this contract, Graves testified that at the same time he signed this partnership agreement, he executed a separate document transferring some or all of the building's ownership to the partnership or to Starkey.[3] It is unclear whether Graves was paid anything in 2006, but he presented evidence that he was paid between $47,000 and $57,000 through the end of 2007;[4] that he was not paid again until April 2008; and that after he was paid a further $14,000, payments were stopped again and never resumed. During the time between the execution of the 2006 and 2007 agreements, Starkey made no capital contributions to the partnership. Although the partnership applied for a bank loan of $1.7 million in November 2006, the loan did not close until after the 2007 partnership agreement was executed.

## B.    The January 2007 Agreement

In January 2007, Graves, TBDL and the General Partner entered into a written partnership agreement. Under the terms of this agreement, Graves was a limited partner, and the contract specified that limited partners had no right of control or management over the partnership's business and affairs. Graves was to contribute the building and have a 49% share of the partnership; TBDL was to

---

[3] Neither document was offered into evidence. In any event, Graves executed a deed conveying the building to the partnership after the 2007 partnership was signed.

[4] The partnership's financial documents indicate that Graves was paid $57,000 in 2007. Graves testified that he was paid $47,000 "the first year" of the partnership, and that Starkey also gave him a check from the partnership for $10,000 that was not part of his salary. According to Graves, the parties had agreed in October 2006 that Starkey would pay him an additional $20,000 for being allowed to invest in the partnership, and the $10,000 payment was supposed to have been part of that payment.

4

contribute $470,000 and have a 49% share; and the General Partner was to contribute $20,000 and have a 2% share. The agreement provides that the General Partner will "receive an annual guaranteed fee, initially in the amount of $78,000 to offset the salary of a General Manager." Unlike the 2006 agreement, parking is not mentioned.

## C.    The April 2008 Agreement

Before the end of March 2008, Starkey told Graves that the partnership needed more than $300,000 in additional capital contributions and insisted that Graves contribute the entire amount. Graves refused, and he testified that Starkey demanded that Graves sign an amended partnership agreement as follows:

> [Starkey] said to sign this or you will be in jail tomorrow morning. And while you're in jail, I'm going to go down and have this thing foreclosed on and I have already made arrangements with the banker for him to come in and buy it directly from the bank and exclude me completely.
>
> In other words, everything that I own would just simply be gone.

As for the grounds for having Graves jailed, Graves testified that Starkey "said he was an attorney and he knew how to do it." Graves signed the agreement.

The relevant terms of the 2008 agreement are the same as those of the 2007 agreement, except that the General Partner and TBDL together contributed an additional $300,000, and a 19% share of the partnership effectively was transferred to them from Graves.[5] After this, the relationship between Starkey and Graves continued to deteriorate until Starkey had Graves locked out the building.

---

[5] Graves's share of the partnership was reduced from 49% to 30%; the General Partner's share of the partnership was increased from 2% to 6%; and TBDL's share was increased from 49% to 64%.

**D.     The Jury's Liability Findings**

Graves sued the Starkey parties, asserting claims against the General Partner and TBDL for breach of all three partnership agreements.[6]  In addition, Graves sought to hold all three of the Starkey parties liable under theories of statutory fraud, common-law fraud, conspiracy to commit fraud, breach of the duties of loyalty and care, and conspiracy to breach the duties of loyalty and care.  The trial lasted for over a month before being submitted to the jury through a lengthy and complex charge.

Regarding the breach-of-contract claims, the jury found that Graves and Starkey "agreed in October 2006 to a written partnership agreement" that included among its terms that (1) Graves "would be co-general partner with Jerry Starkey"; (2) Graves would receive $1,500 per week as compensation; and (3) Starkey "would provide parking as part of his investment."  The jury found that the General Partner breached the 2006, 2007, and 2008 agreements; that TBDL breached the 2006 and 2007 agreements; and that TBDL's breach of the 2007 agreement was excused.

In connection with the statutory-fraud claim, the jury was asked to determine whether Starkey, the General Partner, or TBDL falsely represented a past or existing material fact to Graves to induce him to enter the 2006 agreement.  The jury found that Starkey and TBDL committed statutory fraud, but that Graves "ratified" TBDL's statutory fraud by entering into a new agreement or otherwise affirming the contract after becoming aware of the fraud.

The jury also found that Starkey and the General Partner committed common-law fraud.  Unlike the question in the charge concerning statutory fraud,

---

[6] He also sued Elizabeth Starkey, but she was not found to be liable under any theory.

the question addressing liability for common-law fraud was not restricted to fraudulent acts or omissions concerning a particular agreement.

The questions concerning breach of the duties of loyalty and care were accompanied by an instruction that Graves was required to show that the act or omission constituting the breach was performed or omitted fraudulently, or that it constituted gross negligence or willful misconduct. The jury found that the General Partner and Starkey breached the duties of loyalty and care to Graves.

Finally, the jury found that Starkey and the General Partner conspired to commit statutory or common-law fraud, and that they conspired to breach the duties of loyalty and care to Graves.

## E.    The Jury's Damage Findings and Allocation of Responsibility

As to each liability theory, Graves sought the same two measures of actual damages:  "loss of compensation as general manager sustained in the past," and "out of pocket losses sustained in the past."  The damage questions were unaccompanied by any definitions.  In response to each damage question, the jury found that $173,000 would fairly and reasonably compensate Graves for past loss of compensation, and that $437,000 would fairly and reasonably compensate him for past out-of-pocket losses.  The jury further found by clear and convincing evidence that harm to Graves resulted from common-law fraud and assessed $95,000 in exemplary damages against Starkey and $90,000 against the General Partner.

The jury also was required to answer two questions allocating responsibility for damages associated with three theories of liability.  Jurors were instructed that if they found that more than one person or entity committed statutory or common-law fraud, they were to assign a percentage of responsibility to those persons or

7

entities. The jury was not instructed to ignore any person or entity whose fraudulent conduct had been ratified by Graves. The jury found that Starkey was responsible for 50% of the damages, and the General Partner and TBDL each were responsible for 25% of the damages. Similarly, jurors were instructed to allocate responsibility for the damages resulting from breach of the duties of loyalty and care if they found that more than one person or entity engaged in such conduct. The jury found that Starkey was 60% responsible and the General Partner was 40% responsible.

The jury additionally was instructed that if it found that any party breached any agreement or committed statutory fraud, it was to determine the amount of a reasonable fee for the necessary services of Graves's attorneys. The jury found that $592,000 was a reasonable fee for preparation and trial of the case, and $50,000 was reasonable for any appeal.[7]

## F.    Graves's Election of Remedies

Graves elected to recover against the General Partner and TBDL for breach of the 2006 agreement, and subject to the one-satisfaction rule, to recover against Starkey for statutory fraud. The trial court stated in the judgment that if an appellate court determined that Graves was not entitled to recover his damages under either of these two theories of liability, then he could elect to recover for breach of the 2007 agreement, breach of the 2008 agreement, common-law fraud, or "breach of fiduciary duty," which we understand to refer to breach of the duties of loyalty and care.

---

[7] The General Partner also prevailed in some of its counterclaims against Graves. The jury found that Graves breached the duties of loyalty and care to the General Partner and converted the partnership's funds or personal property. It assessed damages under each theory of liability at $5,000, and the trial court ordered Graves to pay the General Partner $5,000 in actual damages. The portion of the judgment addressing Graves's liability has not been contested, nor does Graves challenge the jury's failure to find Elizabeth Starkey liable on any liability theory.

The trial court rendered judgment holding the General Partner and TBDL jointly and severally liable for actual damages of $610,000 (which is the sum of $173,000 for past loss of compensation and $437,000 for past out-of-pocket losses) and trial attorney's fees of $592,000. The trial court held that Starkey shared liability with the General Partner and TBDL for $310,000 of Graves's actual damages[8] and half of the trial attorney's fees. Finally, the trial court held that if all or part of the judgment against any of the Starkey parties were affirmed, then all Starkey parties that filed a notice of appeal would be jointly and severally liable for appellate attorney's fees of $50,000.

All three Starkey parties appealed the judgment. In addition, Graves filed a cross-appeal challenging the trial court's denial of his post-judgment motion for leave to amend his pleading "to more clearly assert [his] claims for statutory fraud, fraudulent inducement, and breach of [the] dut[ies] of care and loyalty to match the evidence and jury verdict."

## II. SCOPE OF REVIEW

On original submission, parties are not required to address the question of whether, in the event the trial court's judgment is reversed, the party who prevailed at trial is entitled to recover based on the jury's favorable findings under an alternative theory. *See Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988) ("When the jury returns favorable findings on two or more alternative theories, the prevailing party need not formally waive the alternative findings. That party may seek recovery under an alternative theory if the judgment is reversed on appeal."). Nevertheless, if alternative bases for judgment have been

---

[8] Although Starkey does not argue on appeal that the amount for which he was held liable is based on an error in calculation, we note that under the jury's statutory-fraud finding, he would be liable for only 50% of the actual damages, which would be $305,000.

9

briefed by the parties, we can address them on original submission. *See Hatfield v. Solomon*, 316 S.W.3d 50, 60 n.3 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (op. on reh'g). Here, the Starkey parties have challenged the jury's findings on each of Graves's theories of liability,[9] and Graves has responded in his brief. Moreover, Graves has expressed a preference that we render judgment on an alternative theory if possible, rather than remanding the case. We have identified the most favorable judgment that could be rendered and modified the judgment accordingly, and although the extent of liability for certain defendants has increased or decreased and it is necessary to relitigate attorney's fees, the total amount of actual damages remains the same. It nevertheless is true that although the prevailing party is entitled to recover on the most favorable theory supported by the verdict, he is not required to make that election until he knows his choices. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 314 (Tex. 2006). Thus, after Graves's attorney's fees have been reassessed, he may choose whether to

---

[9] In their first issue, the Starkey parties argue that Graves is not entitled to recover damages for lost compensation. In their second issue, they challenge the legal sufficiency of the evidence that Graves suffered any out-of-pocket losses. They assert in their third issue that "the finding imposing obligations to provide parking rights [was] improper." In a portion of their fourth issue, they argue that the 2006 agreement was not legally enforceable because it violated the Statute of Frauds. They contend in their fifth issue that Graves lacks standing to complain about losses to the partnership, breaches of partnership obligations, or misappropriations of partnership property. In their sixth issue, they argue that by signing the 2008 agreement, Graves ratified all prior breaches of contract and tortious conduct by the defendants. They assert in their seventh issue that the finding that Graves was a co-general partner with Starkey is incorrect. In their eighth issue, they challenge the legal sufficiency of the evidence supporting the jury's findings that the General Partner and TBDL breached the 2006, 2007, or 2008 agreements. In their ninth issue, they argue that Graves cannot recover for statutory fraud because the claim was not supported by the pleadings or the evidence. They assert in their tenth and eleventh issues that Graves cannot recover for common-law fraud or for breach of the duties of loyalty and care. In their twelfth issue, they contend that the conspiracy findings are insupportable because the General Partner could not conspire with Starkey. In their thirteenth issue, they argue that if we change the judgment, then we also must reduce or eliminate the award of attorney's fees. They argue in their fourteenth issue that the judgment must be reversed because certain of the jury's findings in connection with Graves's claims of fraud and of breach of the duties of loyalty and care impermissibly included invalid liability theories.

recover on the modified judgment or to relitigate his claims against the Starkey entities and their counterclaims against him.

We therefore will proceed as follows. Because it is potentially dispositive of every other issue, we will begin by addressing the question of standing. We will then work our way through the jury charge, addressing the findings that are reflected in the judgment, discussing each challenged type of relief or category of damages and the theory of liability under it was awarded. The jury was asked to assess two types of damages for every theory of liability; their answers were the same for each cause of action, and we will address each measure of damages separately. If an award under one theory of liability is successfully challenged, we will determine whether the same relief is available based on the jury's findings under an alternative theory of liability. We will then modify the judgment "to give the party all the relief to which he may be entitled either in law or equity." TEX. R. CIV. P. 301. *See also* TEX. R. APP. P. 43.3 ("When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when: (a) a remand is necessary for further proceedings; or (b) the interests of justice require a remand for another trial.").

### III. STANDING

Standing is a component of subject-matter jurisdiction. *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443 (Tex. 1993). A trial court is not authorized to decide a case over which it lacks subject-matter jurisdiction. *Id.* We therefore begin our analysis with the issue of standing, because if the Starkey parties are correct in asserting that Graves lacked standing to assert the claims he has raised, then we must reverse the judgment and dismiss the case. *See Allstate Indem. Co. v. Forth*, 204 S.W.3d 795, 796 (Tex. 2006) (per curiam) (reversing the judgment and dismissing the plaintiff's claims where the plaintiff did not allege

11

that she suffered an actual or threatened injury).

The Starkey parties assert that Graves does not have standing to assert his causes of action because they involve claims owned and damages suffered by the partnership rather than by him individually. The jury charge shows that the claims Graves actually litigated were for (a) breaches of contracts that he signed in his individual capacity; (b) statutory fraud in inducing him, in his individual capacity, to enter into one of the contracts; (c) common-law fraud "against Glen Graves"; (d) conspiracy to commit such statutory or common-law fraud; (e) breach of the duties of loyalty and care "to Glen Graves"; and (f) conspiracy to breach those duties of loyalty and care. Because these are all contractual, statutory, or common-law duties owed to Graves in his individual capacity, the breach of such duties are not claims owned by the partnership.

The Starkey parties also argue that the damages found by the jury are damages sustained by the partnership rather than by Graves individually. We agree that if the Starkey parties misappropriated the partnership's funds or caused the partnership to lose profits or value, then those would be injuries suffered by the partnership, not by Graves individually. He therefore would lack standing to recover such damages. *See Nauslar v. Coors Brewing Co.*, 170 S.W.3d 242, 250 (Tex. App.—Dallas 2005, no pet.). Graves does not dispute this, but instead contends that he did not seek to recover damages for diminution of the partnership's value and other such injuries to the partnership. Instead, the jury was asked to assess damages only for "loss of compensation as general manager sustained in the past" and "out of pocket losses sustained in the past." The question, then, is whether these damages compensate Graves for injuries sustained by the partnership or by Graves individually.

As for the loss of compensation, Graves alleged that there was an agreement

that he personally would receive a stated salary. The jury agreed and found that "Glen Graves and Jerry Starkey agree[d] in October 2006 to a written partnership agreement" in which "Glen Graves would receive $1,500 per week ($78,000 per year) as compensation." Because the contractual duty to pay Graves the stated compensation was a duty owed to him personally, the breach of that duty did not harm the partnership; it harmed Graves. He therefore has standing to recover such damages.

Regarding out-of-pocket losses, the jury received no instructions as to how these were to be measured; thus, jurors were permitted to assess these damages based on injuries sustained by Graves individually. The question of whether there is any evidence that Graves personally was injured is a question of sufficiency of the evidence, not a question of standing. We accordingly overrule this issue.[10]

## IV. THE EXISTENCE AND TERMS OF THE 2006 PARTNERSHIP AGREEMENT

In the first question of the charge, the jury was asked to resolve the following factual dispute about the existence and terms of a written partnership agreement allegedly executed in October 2006:

> Did Glen Graves and Jerry Starkey agree in October 2006 to a written partnership agreement which included the following terms?
>
> Glen Graves would contribute the Peanut Butter Warehouse Building and oversee the project,
>
> Glen Graves would be co-general partner with Jerry Starkey,
>
> Glen Graves would receive $1,500 per week ($78,000 per year) as compensation,
>
> Jerry Starkey would provide parking as part of his investment, and
>
> Jerry Starkey, through [the General Partner] and TBDL, would

---

[10] This was the Starkey parties' fifth issue.

> invest $500,000 and provide borrowing power with the banks for necessary loans.

The jury answered, "Yes." The Starkey parties challenge a portion of the judgment in which the trial court recited certain of the jury's findings about the 2006 agreement's terms.

**A.      The trial court did not err in including in the judgment the finding that the 2006 contract included a term that "Jerry Starkey would provide parking as part of his investment in the Partnership."**

The Starkey parties argue that "the finding imposing obligations to provide parking rights [was] improper" for several reasons. This argument is based on a flawed premise.

The trial court did not impose an obligation to provide parking rights. It stated in the judgment, "It is ORDERED that the 2006 contract between the parties contains the following terms: Jerry Starkey would provide parking as part of his investment in the Partnership . . . ." The jury found that this was one of the terms of the 2006 contract, and the trial court incorporated that finding in the judgment, but the finding did not form the basis of any other relief. Graves did not contend that the breach of this contractual duty caused him past loss of compensation or past out-of-pocket losses, and he sought no other damages for breach of the 2006 contract. The trial court was not asked to enforce this contractual provision or to render declaratory judgment determining its effect on the parties' rights, and the question of whether this provision currently is enforceable was neither presented nor addressed.

We find no error in incorporating a jury finding into the judgment. We therefore overrule this issue, and affirm this portion of the judgment.[11]

---

[11] This is the Starkey parties' third issue.

14

**B.** **The Starkey parties waived their complaint about the finding that Graves and Starkey agreed in the 2006 contract that they would be co-general partners.**

In their statement of the issues presented in this appeal, the Starkey parties have included an issue in which they challenge the finding that the 2006 contract included a provision that Graves would be co-general partner with Starkey; however, they did not brief this issue. It accordingly is waived, and we affirm this portion of the judgment. *See* TEX. R. APP. P. 38.1(i); *In re S.A.H.*, 420 S.W.3d 911, 929 (Tex. App.—Houston [14th Dist.] 2014, no pet.).[12]

## V. PAST LOSS OF COMPENSATION

The jury assessed damages of $173,000 for Graves's past loss of compensation as general manager. He elected to recover these damages from the General Partner and TBDL on his claim for breach of the 2006 contract, and to recover the same damages from Starkey based on his statutory-fraud claim. In accordance with the one-satisfaction rule, the trial court stated in the judgment that Graves "is entitled to only [one] satisfaction of actual damages for his total injury . . . from any combination of [the General Partner], TBDL, LP, and Jerry Starkey up to the amounts for which each is liable." *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 7 (Tex. 1991) ("The one satisfaction rule applies to prevent a plaintiff from obtaining more than one recovery for the same injury. [It applies] when the defendants commit the same act as well as when defendants commit technically differing acts which result in a single injury."). We therefore determine whether the award of these damages can be sustained under the theory on which Graves elected to recover. If it cannot, we will determine if he may recover them under an alternative theory of liability, subject to the one-satisfaction rule.

---

[12] This is their seventh issue.

15

**A.**  **Graves is entitled to recover lost-compensation damages from the General Partner and TBDL for breach of the 2006 contract.**

The jury found that Graves and Starkey agreed in October 2006 to a written partnership agreement that included a provision that "Glen Graves would receive $1,500 per week ($78,000 per year) as compensation." The Starkey parties do not challenge the legal or factual sufficiency of the evidence to support this finding; thus, it is binding on appeal. *See Abatement Inc. v. Williams*, 324 S.W.3d 858, 862 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). The jury further found that the General Partner and TBDL failed to comply with the written 2006 agreement, and that $173,000 would fairly and reasonably compensate Graves for loss of compensation sustained in the past as a result of that breach.

In their appellate arguments attacking this portion of the judgment, the Starkey parties ignore the jury's findings almost entirely.[13] They assert that "[t]he provision upon which Graves relies does not even apply to him, but rather is a right to reimbursement owned by the corporate general partner," but Graves relies on the finding that he and Starkey agreed that "*Glen Graves* would receive $1,500 per week ($78,000 per year) as compensation." (emphasis added). Reimbursement of the corporate general partner was not mentioned in this part of the charge at all. They argue that the 2006 contract was subject to the Statute of Frauds, and suggest that it is unenforceable because it was required to be in writing, but ignore the jury's finding that the agreement *was* in writing. They contend that Graves is not entitled to recover for "lost compensation for *continued* employment," but the jury assessed damages for unpaid compensation for *past* employment, not employment continuing into the future. They maintain that Graves must be considered an at-will employee and that no written provision prevented his termination, but there is

---

[13] These arguments were presented in their first issue.

no finding that Graves was terminated, and the question of whether he was an at-will employee or an independent contractor is irrelevant to the question of whether he was paid as agreed.

The Starkey parties' failure to challenge the findings that the jury actually made forecloses all of these arguments, leaving only their affirmative defenses, to which we now turn.

### 1. The Starkey parties failed to establish conclusively that the 2007 and 2008 agreements supersede the employment-compensation provision of the 2006 agreement.

The Starkey parties maintain that because the 2007 and 2008 agreements contain merger-and-integration clauses, each of those contracts supersedes all prior terms of all prior agreements. But merger is an affirmative defense. *See Flag-Redfern Oil Co. v. Humble Exploration Co.*, 744 S.W.2d 6, 9 (Tex. 1987). It therefore is an issue on which the Starkey parties bore the burden of proof. *See In re Office of Attorney Gen.*, 422 S.W.3d 623, 631 n.10 (Tex. 2013) (orig. proceeding) ("'[T]he defendant bears the burden of proving an affirmative defense.'" (quoting BLACK'S LAW DICTIONARY 482 (9th ed. 2009))). Because the jury was not asked to address this issue, this affirmative defense is waived unless the Starkey parties conclusively established that the employment-compensation provision of the 2006 contract was merged into the 2007 or 2008 contract. *See* TEX. R. CIV. P. 279. We conclude that they have not conclusively established this.

The 2007 and 2008 agreements are not inconsistent with the employment-compensation provision of the 2006 agreement. *See Smith v. Smith*, 794 S.W.2d 823, 828 (Tex. App.—Dallas 1990, writ dism'd) ("A written agreement is not superseded or invalidated by a subsequent integration relating to the same subject matter if the agreement is such that might naturally be made as a separate agreement. Parties to a contract may adjust the details of a transaction without

17

abrogating the entire agreement."). Each of the later agreements provides that "[t]he General Partner shall receive an annual guaranteed fee, initially in the amount of $78,000 to offset the salary of a General Manager . . . ." This language is consistent with the 2006 contract because it acknowledges the parties' intent to employ a general manager at an initial salary of $78,000. The 2007 and 2008 partnership agreements do not purport to alter the employment contract between the parties to the 2006 contract. *Cf. BACM 2001-1 San Felipe Rd. Ltd. P'ship v. Trafalgar Holdings I, Ltd.*, 218 S.W.3d 137, 146 (Tex. App.—Houston [14th Dist.] 2007, pet. denied) ("A modification alters only those terms of the original agreement to which it refers, leaving intact those unmentioned portions of the original agreement that are not inconsistent with the modification."). Because the Starkey parties neither requested that the jury make any findings regarding merger nor established conclusively that the employment-compensation provision of the 2006 agreement was merged into the later agreements, they waived this affirmative defense.

### 2. *The Starkey parties failed to establish conclusively that Graves ratified the breach of the 2006 contract's employment-compensation provision.*

The Starkey parties further contend that by executing the 2008 agreement, Graves ratified any prior breaches of contract. Like merger, ratification is an affirmative defense. *Land Title Co. of Dall., Inc. v. F. M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980). It is "the adoption or confirmation by a person, with knowledge of all material facts, of a prior act which did not then legally bind that person and which that person had the right to repudiate." *Chrisman v. Electrastart of Hous., Inc.*, No. 14-02-00516-CV, 2003 WL 22996909, at *5 (Tex. App.— Houston [14th Dist.] Dec. 23, 2003, no pet.) (mem. op.). Whether a person has ratified an act is "essentially a question of fact, to be determined from all the

18

circumstances [in] evidence." *Id.* (quoting *Colvin v. Blanchard*, 103 S.W. 1118, 1119 (Tex. Civ. App.—Fort Worth 1907), *aff'd*, 101 Tex. 231, 106 S.W. 323 (1908)).

Although the jury was asked whether Graves ratified any statutory or common-law fraud committed by the Starkey parties, the jury was not asked whether Graves ratified any breach of contract. Thus, the affirmative defense that Graves ratified a breach of contract is waived unless it is conclusively established. *See* TEX. R. CIV. P. 279.

Once again, the Starkey parties have not met that burden. Although they have cited cases dealing with ratification of fraud,[14] they have cited no authority in which a party's execution of one contract constituted a ratification of the breach of a different contract. *See* TEX. R. APP. P. 38.1(i). The ratification arguments they make in connection with the breach-of-contract claims instead appear to be dependent on the success of their merger arguments, which we have rejected.

In sum, we overrule the Starkey parties' arguments pertaining to the liability of TBDL and the General Partner to pay Graves $173,000 for loss of compensation sustained in the past as a result of their failure to comply with the written 2006 agreement.[15] We affirm that portion of the judgment.

## B. There is legally insufficient evidence to support the judgment against Starkey based on statutory fraud.

Graves elected to recover past loss of compensation from Starkey based on the jury's findings that Starkey committed statutory fraud and was responsible for

---

[14] *See, e.g.*, *R & L Inv. Prop., L.L.C. v. Hamm*, 715 F.3d 145, 149–51 (5th Cir. 2013); *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 676–80 (Tex. 2000); *B & R Dev., Inc. v. Rogers*, 561 S.W.2d 639, 642–43 (Tex. Civ. App.—Texarkana 1978, writ ref'd n.r.e.); *Wise v. Pena*, 552 S.W.2d 196, 199 (Tex. Civ. App.—Corpus Christi 1977, writ dism'd).

[15] These arguments formed all or part of the Starkey parties' first, fourth, sixth, and eighth issues.

50% of the damages Graves sustained as a result of any statutory or common-law fraud. We agree with the Starkey parties' argument that no evidence supports the statutory-fraud finding.[16]

When the opposing party fails to object to the charge, we measure the sufficiency of the evidence by the charge as submitted. *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 221 & n.30 (Tex. 2005). We analyze legal sufficiency by considering the evidence in the light most favorable to the verdict and indulging every reasonable inference that would support the challenged finding, crediting favorable evidence if a reasonable factfinder could and disregarding contrary evidence unless a reasonable factfinder could not. *See City of Keller v. Wilson*, 168 S.W.3d 802, 819, 827 (Tex. 2005). We will sustain a legal-sufficiency challenge only when (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *Id.* at 810.

The statutory-fraud claim is based on the following statute, which makes it unlawful to commit fraud in real-estate and stock transactions:

(a) Fraud in a transaction involving real estate or stock in a corporation or joint stock company consists of a

    (1) false representation of a past or existing material fact, when the false representation is

        (A) made to a person for the purpose of inducing that person to enter into a contract; and

        (B) relied on by that person in entering into that contract; or

---

[16] Because this argument is dispositive of the claim, we express no opinion on the Starkey parties' arguments that statutory fraud was not pleaded and does not apply to this transaction.

20

(2)   false promise to do an act, when the false promise is

    (A)   material;

    (B)   made with the intention of not fulfilling it;

    (C)   made to a person for the purpose of inducing that person to enter into a contract; and

    (D)   relied on by that person in entering into that contract.

TEX. BUS. & COM. CODE ANN. § 27.01(a) (West 2009).  A person who commits statutory fraud is liable to the person defrauded not only for actual damages, but also for attorney's fees, expert-witness fees, costs for copies of depositions, and costs of court.  *Id.* § 27.01(e).

The jury was not asked to determine whether the Starkey parties made any false promises such as those discussed in section 27.01(a)(2) of the statutory-fraud provision.  Instead, the jury was asked only whether each of the Starkey parties made a false representation of a past or existing material fact for the purpose of inducing Graves to enter into the 2006 agreement.  Although the jury found that Starkey did so, we have found no evidence that supports this finding.[17]

In his responsive brief, Graves identifies only two statements that he contends were false representations of present or existing facts made to induce him to enter the 2006 contract.  First, he states that "Starkey effectively represented that the [2006] agreement was valid and accurately reflected their deal."  But that representation was true, as is shown by the jury's finding that Starkey and Graves agreed in October 2006 to a written partnership agreement containing the terms described by Graves.  Graves points out that Starkey "*now* says . . . that the 2006 agreement, as Graves explained it at trial, did not accurately reflect the parties'

---

[17] The jury also found that TBDL committed statutory fraud, but it found that Graves ratified TBDL's conduct.

deal." (emphasis added). The jury, however, did not believe Starkey's later statement; thus, at best, Starkey's denial of the 2006 agreement's existence and terms was a misrepresentation made five years after the agreement. Moreover, Graves emphatically did not rely on Starkey's denial.

The second misrepresentation that Graves identified is that "Starkey falsely represented in October 2006 that he was Graves's lawyer. . . . Starkey *now* denies that he was ever Graves's lawyer." (emphasis added). But if Starkey represented that he was Graves's attorney and Graves relied on that representation, then Starkey *was* Graves's attorney. *See Valls v. Johanson & Fairless, L.L.P.*, 314 S.W.3d 624, 633–34 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (explaining that "an attorney-client relationship arises from a lawyer's agreement to render professional services to a client" and "may arise by implication if the lawyer knows a person reasonably expects him to provide legal services but does nothing to correct that misapprehension"). Where this particular statement is concerned, any implied finding that the representation was made and was relied upon would negate an implied finding that the representation was false.

We sustain the Starkey parties' no-evidence challenge to the jury's statutory-fraud finding.[18] Because statutory fraud is the only cause of action that would have supported the award of expert fees and the cost of obtaining copies of depositions, we reverse the portion of the judgment ordering Starkey to pay Graves for those expenses. It is possible, however, that even though Graves cannot recover loss-of-compensation damages from Starkey for statutory fraud, the same damages can be sustained by the jury's findings on an alternative theory of liability. We therefore turn next to the arguments directed to those alternative theories.

---

[18] This argument formed a part of the Starkey parties' ninth issue. In light of our holding that there was no evidence to support the statutory-fraud claim submitted, we do not address Graves's conditional cross-issue.

**C. Graves cannot recover for common-law fraud or conspiracy to commit fraud, because in those parts of the charge, common-law fraud was commingled with the unsupported statutory-fraud claim.**

A trial court errs if, over a preserved objection, it submits to the jury a broad-form question that is based in part on a theory of liability for which there is no evidence. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 381 (Tex. 2000) (op. on reh'g) ("[S]ubmitting invalid theories of liability in a single broad-form jury question is harmful error when it cannot be determined whether the jury based its verdict on one or more of the invalid theories."); *see also Romero*, 166 S.W.3d at 225–26 (applying the same reasoning to a question in which the jury was asked to allocate responsibility based in part on a theory of liability for which there was no evidence). Here, the parties agreed on the record that all no-evidence objections to every question in the charge were preserved.

Several such no-evidence objections were valid. A number of questions in the charge were predicated in part on the jury's finding that at least one of the Starkey parties committed statutory fraud. Most of these questions commingled statutory and common-law fraud.[19] Specifically, the jury was instructed that if it found that any of the Starkey parties committed statutory fraud or common-law fraud, it was to (1) answer one question assessing all of the damages for both types of fraud, (2) allocate 100% of the responsibility for those damages among the persons that the jury found committed either type of fraud, and (3) determine whether each defendant conspired to commit fraud. The Starkey parties argue that because there is no evidence to support the statutory-fraud claim, the trial court reversibly erred in submitting each of these questions.[20] We agree. Because we

---

[19] An additional question concerning attorney's fees commingled statutory fraud and breach of contract, but the Starkey parties briefed that issue separately, and we have addressed it under a separate heading. *See* section VII, *infra*.

[20] A ratification question also was predicated in part on the statutory-fraud finding, but the

are not reasonably certain that the jury was not significantly influenced by the statutory-fraud finding when answering these questions, we conclude that the error was harmful.[21] *See Romero*, 166 S.W.3d at 227–28. We therefore cannot base a damage award on the alternative theories of common-law fraud or conspiracy to commit fraud, because these were predicated in part on the erroneous statutory-fraud finding. [22]

## D. Graves can recover past loss-of-compensation damages from Starkey and the General Partner for breach of the duties of loyalty and care.

The Starkey parties do not specifically contend that Graves is not entitled to recover a particular category of damages that resulted from the breach of the duties of loyalty and care. Instead, they argue more generally that Starkey and the General Partner cannot be held liable for breach of these statutory duties at all. For

Starkey parties do not complain of charge error concerning that question.

[21] This is a part of the Starkey parties' fourteenth issue. In light of our disposition of this issue, it is unnecessary to discuss in detail their tenth issue, which contains further challenges to the common-law-fraud findings. Most of the arguments offered in support of the Starkey parties' tenth issue are the same merger and ratification arguments we previously have rejected. The Starkey parties also fail to discuss any evidence other than the 2008 agreement. Moreover, they do not even identify the misrepresentations and nondisclosures on which Graves's common-law fraud claim could have been based. Finally, they assert that there is no evidence of any misrepresentation, but they do not contend that there is legally insufficient evidence of fraud by non-disclosure, and the jury was instructed that it could base a fraud finding on a misrepresentation or a non-disclosure. We also do not reach the portion of their twelfth issue in which they challenge the jury's finding that Starkey and the General Partner conspired to defraud Graves. Like the fraud-related damage questions and percentage-of-responsibility questions, that fraud-conspiracy question was predicated in part on the erroneous statutory-fraud finding.

[22] We reverse part of the judgment based on charge error, which normally would require that we remand for a new trial, at least as to those theories of liability that were improperly commingled with others for which there was no evidence. *See Romero*, 166 S.W.3d at 230–31. Here, however, it may be unnecessary to relitigate those issues because (a) the same damages are supported by the jury's findings on alternative theories of liability that were not affected by the charge error; (b) the parties have briefed all of the alternative theories; (c) the judgment specifically provides that if it cannot be sustained on appeal based on the remedies Graves elected in the trial court, he may elect to recover on one of the alternative theories of liability; and (d) to conserve judicial resources, Graves has asked that we render judgment based on an alternative theory rather than remanding for him to make such an election in the trial court.

24

the reasons discussed below, we conclude that none of these arguments has merit.

### 1. The 2008 agreement does not disclaim all duties of loyalty and care.

The Starkey parties assert that Graves cannot recover for breach of the duties of loyalty and care because the 2008 agreement supersedes the prior agreements and disclaims these statutory duties. We need not address their contention that the 2008 agreement supersedes all prior agreements, because in any event, the Starkey parties are mistaken about its content. The 2008 agreement limits but does not disclaim all such duties and liability,[23] and the instructions accompanying the relevant questions in the charge included that contract's language containing the limitation of these statutory duties. That instruction was as follows:

> To prove [a defendant] failed to comply with its duty, Glen Graves must show that [the defendant's] actions or omissions were:
>
> performed or omitted fraudulently
>
> constituted gross negligence, or
>
> constituted willful misconduct.
>
> "Gross negligence" means an act or omission by [the defendant],
>
> (a)     Which when viewed objectively from the standpoint of [the defendant] at the time of its occurrence involve[d] an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and
>
> (b)     Of which [the defendant] ha[d] actual, subjective awareness of the risk involved, but nevertheless proceed[ed] with conscious indifference to the rights, safety, or welfare of others.
>
> You are instructed that under the Partnership Agreement,[24] the General Partner, when permitted to make a decision in its discretion,

---

[23] Nor could it disclaim these duties entirely. *See* TEX. BUS. ORGS. CODE ANN. § 152.002(b)(2), (b)(3) (West 2012) (providing that neither the partnership agreement nor the partners may "*eliminate* the duty of loyalty" or "*eliminate* the duty of care") (emphasis added).

[24] The "Partnership Agreement" mentioned here was not identified as the 2006, 2007, or 2008 agreement.

25

shall be entitled to consider such interests and factors as it desires and may consider its own interests. Further, the General Partner may take any action or make any decision pursuant to the authority granted it in the Partnership Agreement so long as such action or decision was not performed or omitted with the intent to defraud or deliberately cause injury to the Limited Partners.

You are further instructed that neither the General Partner, its Affiliates, nor any owner, manager, officer, director, partner, employee or agent of the General Partner or its Affiliates, shall be liable, responsible or accountable in damages or otherwise to the Partnership or any Partner for any action taken or failure to act (even if such action constituted the negligence of a person) on behalf of the Partnership within the scope of the authority conferred on the person described in this Agreement or by law unless such act or omission was performed or omitted fraudulently or constituted gross negligence or willful misconduct.

The jury impliedly found that the acts or omissions that breached the duties of loyalty and care were performed or omitted fraudulently, or that they constituted gross negligence or willful misconduct. The Starkey parties do not challenge these implied findings, which support the imposition of liability.

### 2. *The Starkey parties' argument concerning alleged charge error in connection with this liability theory was not preserved for review.*

The Starkey parties additionally contend that Graves cannot recover against Starkey under this theory of liability because there is no jury finding that Starkey owed Graves duties of loyalty and care in the first place; however, the Starkey parties did not object in the trial court that the question concerning Starkey's liability was required to be predicated on a factual finding that he owed Graves any such duties. *Cf.* TEX. R. CIV. P. 278 (explaining that if a party relies on an omitted question, the opposing party preserves error by objecting to the omission). Thus, if such a finding is necessary, then it is deemed found. *See* TEX. R. CIV. P. 279 (providing that if the jury finds one or more elements essential to a ground of recovery and necessarily referable to that ground, but other unrequested elements

26

were omitted without objection, the omitted elements are deemed found in support of the judgment).

We overrule this issue. We also overrule the related argument that in the absence of such a predicate question, the liability findings improperly commingled valid and invalid liability theories.[25]

### 3. *Starkey can be held jointly and severally liable with the General Partner for damages Graves sustained as a result of their breach of the duties of loyalty and care.*

Three questions were predicated on the jury's finding that at least one of the Starkey parties breached the duties of loyalty and care. First, the jury was asked to allocate responsibility among the liable parties. The jury found that Starkey was responsible for causing or contributing to cause 60% of Graves's damages, and the General Partner was responsible for the remaining 40%. Second, the jury assessed damages, and as with all of the other damage questions, the jury found that as a result of this conduct, Graves sustained damages of $173,000 in past loss of compensation and $437,000 in past out-of-pocket losses. Third, the jury was asked to determine if each defendant conspired in the breach of the duties of loyalty and care that damaged Graves. The jury found that only Starkey and the General Partner were part of such a conspiracy.

Starkey argues that he cannot be held jointly and severally liable with the General Partner based on the conspiracy finding because the General Partner could not conspire with its only agent. He additionally contends that imposing joint liability based on the conspiracy finding would impermissibly circumvent the requirements for proving alter-ego liability. It is unnecessary for us to address

---

[25] These arguments were made in the Starkey parties' eleventh and fourteenth issues.

27

these arguments because they make no difference to the outcome of the case.[26] We have upheld the finding that Starkey and the General Partner are liable for breach of the duties and loyalty and care, and the Starkey parties do not challenge the jury's finding allocating 60% of the responsibility for this claim to Starkey; thus, Starkey can be held jointly and severally liable with the General Partner for these damages even in the absence of a conspiracy finding. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.013(b) (West 2008) (providing that a defendant who is more than 50% responsible for the damages associated with a particular cause of action is jointly and severally liable for those damages).

We accordingly hold that although Graves cannot recover past loss of compensation from Starkey for statutory fraud, Starkey can be held jointly and severally liable with the General Partner for past loss of compensation resulting from their breach of the duties of loyalty and care.

## VI. OUT-OF-POCKET LOSSES

We begin by clarifying the issue presented for our review in connection with the findings that Graves sustained out-of-pocket losses in the past. In their statement of the issues, the Starkey parties asserted that there is legally and factually insufficient evidence to support the damages awarded for out-of-pocket losses.[27] In their briefing, however, they challenge only the existence of out-of-pocket losses on the same grounds on which they challenged Graves's standing. They do not challenge the amount awarded, and they do not mention the factual sufficiency of the evidence again. Any challenge to the amount of out-of-pocket

---

[26] These arguments were raised in the Starkey parties' twelfth issue.

[27] As with the award of lost compensation, Graves elected to recover these damages from the General Partner and TBDL for breach of the 2006 contract, and to recover the same damages from Starkey based on his statutory-fraud claim. Again, the awards were subject to the one-satisfaction rule.

28

losses found by the jury or to the factual sufficiency of the evidence of such losses has been waived. TEX. R. APP. P. 38.1(i). We accordingly address only the legal sufficiency of the evidence that any such damages exist.

Before we can do so, we also must identify the correct standard by which the sufficiency of the evidence is measured. In their respective briefs, the Starkey parties focus on "out-of-pocket damages" as that phrase is used in fraud cases, while Graves emphasizes the definition of "out-of-pocket damages" used in breach-of-contract actions.[28] Each side's arguments suffer from the same flaw: they ignore the charge. Here, the jury was told to find the amount of Graves's past out-of-pocket losses without *any* definition of that term. No one asked the trial court to include an instruction explaining what an out-of-pocket loss is or how or when it is measured, and no one objected to the absence of any such instructions. Thus, the jury was left to interpret the phrase "out of pocket losses" as those words are commonly understood by non-lawyers, and we must measure the sufficiency of the evidence by that standard. *See Romero*, 166 S.W.3d at 221; *Securitycomm Grp., Inc. v. Brocail*, No. 14-09-00295-CV, 2010 WL 5514333, at *4 (Tex. App.— Houston [14th Dist.] Dec. 28, 2010, pet. denied) (mem. op.) (explaining that where

---

[28] In cases of fraud or negligent misrepresentation, out-of-pocket damages are the difference between the value paid and the value received, measured at the time of the transaction. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997) (sub. op.). But where liability is based on breach of contract, such out-of-pocket damages are not necessarily determined as of that date. In a contract claim, out-of-pocket damages protect a reliance interest by restoring to the non-breaching party the expenditures made in reliance on the contract. *See Wes-Tex Tank Rental, Inc. v. Pioneer Natural Res. USA, Inc.*, 327 S.W.3d 316, 320 n.4 (Tex. App.—Eastland 2010, no pet.). These out-of-pocket damages include "expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed." *Mistletoe Express Serv. of Okla. City, Okla. v. Locke*, 762 S.W.2d 637, 638 (Tex. App.—Texarkana 1988, no writ) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 349 (1981)). Thus, where liability is based on breach of contract, out-of-pocket damages can be used to reimburse the non-defaulting party for expenditures made to perform the contract, regardless of whether those expenditures were made before the contract was signed or during the course of performance.

the charge instructed the jury to measure damages by "out-of-pocket expenses" but did not define the term, jurors were "free to use the ordinary definition of 'out-of-pocket' rather than the legal definition in Texas, and our review is similarly defined").

We have identified two ways in which jurors could have interpreted the words "out of pocket." They could have read the phrase to have the same meaning that it does in the expressions "out-of-pocket costs" or "out-of-pocket expenses," that is, an outlay of cash. *See Securitycomm Grp.*, 2010 WL 5514333, at \*4; WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 838 (1991). Jurors also could have read "out of pocket" more broadly to mean a financial loss. *See* 2 THE COMPACT EDITION OF THE OXFORD ENGLISH DICTIONARY 2218 (1971) (noting that "to be out of pocket" means "to be a loser (by some transaction)," as in "The proprietors complain . . . they are yet out of pocket by it"). We therefore will determine if there is more than a scintilla of evidence that Graves sustained either kind of loss in the past.

**A.      There is legally insufficient evidence that Graves sustained past out-of-pocket losses as a result of a breach of contract.**

To recover damages for breach of contract, the breach must have caused those damages. *Hatfield*, 316 S.W.3d at 65. A loss results from a breach of contract if the loss is the natural, probable, and foreseeable consequence of the breach. *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). But there is no evidence that a breach of any of the partnership agreements by any of the Starkey parties caused Graves to sustain a past out-of-pocket loss as that term would have been understood by jurors.

First, there is no evidence that a breach of contract resulted in an outlay of cash in the past. Graves does not contend otherwise.

30

Second, there is no evidence that he sustained a financial loss in the past as a result of a breach of contract. Graves contends that he contributed the building and "received nothing from the partnership—no payments, no profits, no distributions." But with the exception of the obligation to pay him the compensation agreed upon for his work as the general manager, there is no evidence that under the terms of any of the contracts, he was required to be paid any "payments, profits, or distributions" in the past. To see why this is so, let us look at the terms of each agreement, beginning with the most recent.

In the 2008 amended partnership agreement, Graves agreed that in exchange for contributing the building to the partnership, he would receive a 30% share of "distributable cash" under the contract's terms if and when such a distribution was made, but there is no evidence in the record that a distribution was made or was required to have been made. *See In re Prodigy Servs., LLC*, No. 14-14-00248-CV, 2014 WL 2936928, at *5 (Tex. App.—Houston [14th Dist.] June 26, 2014, orig. proceeding) (mem. op.) (explaining that a partnership interest "is the partner's right to receive his distributive share of the profits and surpluses of the partnership"). He also would receive a 30% share of the proceeds distributed upon the winding up and termination of the partnership's business, but this event had not occurred by the time of trial, either. As of the time of trial, Graves still retained his 30% share of the partnership, which is exactly what he was to receive under the contract's terms. Thus, regardless of whether Graves sustains any financial loss in the future as a result of the Starkey parties' breach of contract, there is no evidence that he already has sustained such a loss.

The terms of the 2007 agreement were the same as the 2008 agreement except that under the 2007 agreement, Graves would have received a 49% share of distributions if any had been made, whether as a result of a distribution declared by

31

the General Partner or as a result of the winding up and termination of the partnership's business. But just as with the 2008 agreement, there is no evidence that any distributions were made or were required to have been made, or that the partnership has terminated.

As for the 2006 agreement, the only terms that we know existed are those found by the jury. The jury found that Graves and Starkey agreed that Graves would be compensated at the rate of $1,500 per week, but the breach of that provision was addressed by the jury's assessment of damages for past loss of compensation. None of the other terms found by the jury required anyone to make any other payment to Graves in the past.

At trial, Graves characterized the evidence as presenting another possible basis for finding past out-of-pocket losses. There is evidence that Starkey and Graves specified in the 2007 and 2008 contracts that when Graves contributed the building, its agreed value after deducting liabilities was $1.2 million, but Starkey and the General Partner caused the partnership's books to indicate that this was the building's value before deducting liabilities. According to Graves's evidence, the result is that on the partnership's books, Graves's initial capital contribution—and thus, the balance in his capital account going forward—is hundreds of thousands of dollars less than it should be. The capital-account balances affect the amount each partner is entitled to receive upon the winding up and termination of the partnership, but that has not happened yet. Thus, the reduction in Graves's capital account on the partnership's books has not caused Graves a past financial loss.

We sustain this portion of the issue presented as it pertains to the legal sufficiency of the evidence that Graves sustained out-of-pocket losses in the past as

a result of any of the Starkey parties' breach of contract.[29]  As discussed below, however, Graves can recover the same damages from Starkey and the General Partner under an alternative theory of liability.

**B.    There is legally sufficient evidence that Graves sustained past out-of-pocket losses as a result of the breach of the statutory duties of loyalty and care.**

Although Graves sought the same damages for every cause of action and the parties frequently ignore the distinctions between different theories of liability, the claims involve different conduct—and sometimes, different results.  Graves did not sustain a past out-of-pocket loss as a result of a breach of contract, because with the exception of the breach of the obligation to pay him the agreed compensation, he received what he bargained for.  But there is evidence that Graves sustained an out-of-pocket loss in the past when, as a result of the breach of the duties of loyalty and care, he lost part of what he *did* receive in exchange for contributing the building:  his partnership interest.

Under the terms of the 2007 agreement, Graves owned a 49% share of the partnership.  After signing the 2008 agreement, he owned a 30% share of the partnership.  Thus, on the day he signed the 2008 agreement, he lost a 19% share of the partnership.  If there is more than a scintilla of evidence that this share of the partnership had financial value at that time, then losing it was a financial loss, and hence, an out-of-pocket loss.

Here, the Starkey parties' own actions implicitly recognized that the 19% partnership interest had financial value.  In March 2008, Starkey made a "cash call" in which he told Graves that the partnership needed additional contributions of more than $300,000.  According to Graves, Starkey demanded that Graves

---

[29] The challenge to the legal sufficiency of the evidence of out-of-pocket losses was part of the Starkey parties' second issue.

provide all of these funds. Graves testified that because he would not agree to contribute the money, Starkey demanded that he sign the 2008 amended partnership agreement, and threatened that if Graves did not sign it, then Starkey would have him thrown in jail. Graves signed. The effect of the 2008 agreement was that TBDL and the General Partner agreed to contribute an additional $300,000 to the partnership and their interest in the partnership was increased by a total of 19%, while Graves's interest was reduced by 19%. Under the terms of the 2008 agreement, the increase in the General Partner and TBDL's contribution and partnership interest—and corresponding decrease in Graves's partnership interest—was treated as a sale of that partnership interest.[30] In effect, the General Partner and TBDL purchased an additional 19% partnership interest for $300,000. This is more than a scintilla of evidence from which a reasonable jury could conclude that when Graves signed the 2008 contract and lost a 19% share of the partnership, he suffered an out-of-pocket loss.

The Starkey parties maintain that Graves suffered no out-of-pocket losses at the time of his initial investment in the partnership, but under the language of the

---

[30] Both the 2007 and 2008 agreements provided as follows:

> In the event the General Partner determines that funds in addition to [the initial capital contributions] are necessary to carry out the purposes of the Partnership and the General Partner and the Limited Partners do not agree to contribute such funds in their respective Sharing Ratios, the General Partner is authorized to offer and sell additional Partnership Interests and admit any purchasers thereof (which may include existing Partners or their Affiliates) as additional limited partners of the Partnership.

Although these agreements permitted the General Partner (and Starkey, as the General Partner's agent) to take such actions, the agreements also specified that if an act was within the authority of the General Partner or its agents, the actor would not be liable to the other partners "unless such act or omission was performed or omitted fraudulently or constituted gross negligence or willful misconduct." As we previously have pointed out, the Starkey parties do not challenge the jury's implied findings that the acts or omissions that breached the duties of loyalty and care were performed or omitted fraudulently, or that they constituted gross negligence or willful misconduct. *See supra*, section V.D.1.

charge, the jury was not limited to considering losses that occurred at that time. They also contend that Graves seeks only to recover for reduction in the value of his partnership interest, but they ignore the reduction in the size of his partnership interest; thus, they do not contend that loss of part of Graves's partnership interest was not an out-of-pocket loss.

We already have addressed the Starkey parties' remaining challenges to any recovery for breach of the duties of loyalty and care, and for the reasons previously discussed, we reject those arguments.[31] As for Graves's remaining theories of liability that arguably could support an award of damages for past out-of-pocket losses—statutory fraud, common-law fraud, and conspiracy to commit fraud—the same reasons that prevent Graves from recovering damages for past loss of compensation under those theories also prevent him from recovering damages for past out-of-pocket losses.[32]

## VII. ATTORNEY'S FEES

In the final issue we address, the Starkey parties argue that if we reverse or modify the judgment as to damages, then we also must reverse the award of attorney's fees. The jury assessed attorney's fees based on its breach-of-contract and statutory-fraud findings, and Graves elected to recover from TBDL and the General Partner based on breach of contract and to recover against Starkey based on statutory fraud. Attorney's fees are available to the prevailing party in connection with each of these causes of action. *See* TEX. BUS. & COM. CODE ANN. § 27.01(d) (statutory fraud); TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008) (breach of contract). We have concluded, however, that Graves is not entitled to recover on his statutory-fraud claim; thus, he can no longer recover

---

[31] *See supra*, section V.D.

[32] *See supra*, sections V.B and V.C.

attorney's fees from Starkey. We also have concluded that there is no evidence that Graves suffered past out-of-pocket losses as a result of a breach of contract, and we accordingly have reduced the amount of damages that he can recover from TBDL and the General Partner for breach of contract by more than two-thirds.

Under these circumstances, we cannot be reasonably certain that in assessing a reasonable fee for the necessary services of Graves's attorney, the jury was not significantly influenced by the consideration of damages and theories of liability for which there is no evidence. *See Barker v. Eckman*, 213 S.W.3d 306, 313–15 (Tex. 2006). We therefore agree that the attorney's-fee award must be reversed and that issue must be remanded.[33]

## VIII. DISPOSITION

The ultimate disposition of this case is complicated in that it turns on an election that Graves is not yet required to make. On one hand, because the jury's favorable common-law-fraud findings were based on an erroneous charge, Graves is entitled to relitigate them. And because his various claims against the Starkey parties (and the General Partner's counterclaims against him) are not separable from the fraud claims without unfairness to the parties, all of those claims would have to be retried.[34] On the other hand, Graves prevailed on alternative theories of

---

[33] This was the Starkey parties' thirteenth issue.

[34] After reversing a judgment, the appellate court "can limit the scope of remand to the part affected by the error if that part is separable without unfairness to the parties." *Nat'l City Bank of Ind. v. Ortiz*, 401 S.W.3d 867, 884 (Tex. App.—Houston [14th Dist.] 2013, pet. denied) (op. on reh'g) (citing TEX. R. APP. P. 44.1(b)). But Graves's various fraud claims cannot be separated from any of his other claims against the Starkey parties without unfairness to the parties, as is shown by Graves's position that he sustained the same two measures of damages in the same amounts, regardless of which parties were liable or the conduct on which liability was based. The General Partner's counterclaims for conversion and breach of the duties of loyalty and care are compulsory counterclaims that also are not separable without unfairness to the parties. *See Double Ace, Inc. v. Pope*, 190 S.W.3d 18, 25–27 (Tex. App.—Amarillo 2005, no pet.) (where judgment against a corporation on its claims for breach of contract, breach of fiduciary duty, and

liability, and he can choose to recover on those theories. He cannot do both, however, because he is not entitled to multiple recoveries for the same injuries. Moreover, Graves is not required to choose until after attorney's fees are relitigated, because until then, he will not know what he would be giving up to pursue a new trial. *See Tony Gullo Motors I, L.P.*, 212 S.W.3d at 314–15.

The result is that two steps must performed on remand. First, the factfinder must reassess the attorney's fees that Graves can recover from the General Partner and TBDL based on their breach of the 2006 contract, which caused him damages of $173,000 for past loss of compensation. Second, Graves must elect whether to (a) stand on his right to recover damages and the reassessed attorney's fees based on the jury's remaining findings that were not successfully challenged on appeal; or (b) exercise his right to a new trial of all of his claims against the Starkey parties and their counterclaims against him. If he chooses the first option, then his most favorable judgment would be as set forth below. If he chooses a new trial, then the existing findings on Graves's claims against the Starkey parties and their counterclaims against him will cease to have any legal effect.

## IX. CONCLUSION

Although we must reverse parts of the judgment due to charge error or lack of evidence, Graves still can recover actual damages in the same amount found by the jury based on alternate theories of liability. Unless Graves elects a new trial, our judgment primarily will affect the extent of the Starkey parties' individual

---

fraud were reversed on appeal, the general manager and president's compulsory counterclaims also had to be reversed and remanded).

In contrast, no claims between Graves and Elizabeth Starkey were challenged on appeal, and those claims are separable without unfairness to the parties. The take-nothing judgment on Graves's claims against her remains intact, and those claims are excluded from the scope of remand, regardless of any election that Graves makes. *See Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 446 (Tex. 1989).

liability and the ancillary relief associated with particular causes of action. Because no evidence supports the statutory-fraud finding, Graves is not entitled to recover the costs for copies of depositions or expert witnesses, and because the amount of damages that Graves can recover on causes of action for which attorney's fees are recoverable has been reduced by more than two-thirds, we reverse the portion of the judgment awarding attorney's fees and remand for relitigation of that issue.

The net result is as follows:

A.    We affirm the portion of the judgment in which the trial court stated the terms of the written 2006 contract as found by the jury;

B.    Regarding damages for past loss of compensation, we modify the judgment to

    1.    hold the General Partner and TBDL jointly and severally liable to Graves for past loss of compensation in the amount of $173,000 as a result of their breach of the written 2006 partnership agreement;

    2.    hold Starkey and the General Partner liable to Graves for past loss of compensation in the amount of $173,000 as a result of their breach of the duties of loyalty and care, with Starkey being solely liable for 60% of this amount ($103,800), and jointly and severally liable with the General Partner for the remaining 40% ($69,200);

    3.    order that the recovery of damages for past loss of compensation is subject to the one-satisfaction rule, so that Graves may recover no more than $173,000 for those damages from any combination of Starkey, the General Partner, and TBDL;

C.    Regarding damages for out-of-pocket losses sustained in the past, we modify the judgment to hold Starkey and the General Partner liable to Graves for past out-of-pocket losses of $437,000 as a result of their breach of the duties of loyalty and care, with Starkey being solely liable for 60% of this amount ($262,200), and jointly and severally liable with the General Partner for the remaining 40%

($174,800);

D.    We reverse the portions of the judgment in which the trial court held Starkey liable for statutory fraud and required him to pay Graves's deposition costs and expert fees;

E.    We reverse the awards of attorney's fees; and

F.    We remand the case for

    1.    relitigation of the amount of reasonable and necessary attorney's fees to be recovered from the General Partner and TBDL in light of the reduced amount of damages on causes of action for which such fees are recoverable;

    2.    recalculation of the interest recoverable from each of the Starkey parties in light of this court's modification of the judgment and the relitigation of attorney's fees; and

    3.    Graves's election between

        (a)    rendition of judgment in accordance with those adjustments and incorporating the modifications described in this opinion, but leaving intact the portions of the trial court's judgment that were not successfully challenged in this appeal;[35] or alternatively,

        (b)    a new trial on his claims against the Starkey parties and their claims against him, leaving intact only the take-nothing judgment on Graves's claims against Elizabeth Starkey.


/s/        Tracy Christopher
            Justice


Panel consists of Justices Christopher, McCally, and Brown.

---

[35] If Graves elects to recover on the jury's favorable findings as set forth in this opinion, then none of his theories of liability will be relitigated, and the General Partner's $5,000 judgment against Graves and the take-nothing judgment on his claims against Elizabeth Starkey will be unaffected.