**Opinion of June 5, 2014 Withdrawn; Reversed, Remanded, and Substitute Opinion filed September 25, 2014.**



In The

# Fourteenth Court of Appeals

### NO. 14-13-00161-CV

**JJJJ WALKER, LLC; DYNAFAB USA, LLC; RENAISSANCE PROPERTIES OF TEXAS, LLC; PRIYA PROPERTIES, LLC; BD TEXAS, LLC; AND KW HOSPITAL ACQUISITION, LLC, Appellants**

**V.**

**ERIC YOLLICK, Appellee**

**On Appeal from the 281st District Court
Harris County, Texas
Trial Court Cause No. 2010-41034**

### S U B S T I T U T E   O P I N I O N

We deny the appellee's motion for rehearing, withdraw our opinion and judgment dated June 5, 2014, and issue this substitute opinion in its place.

In this fraud case, the plaintiffs prevailed in their claims against a bank, the bank's corporate agent, and the bank's attorney, but the trial court granted judgment notwithstanding the verdict on the claim against the bank's attorney on the ground that no evidence supported the liability finding. In arguments that we treat as cross-points,

the attorney argues that the economic-loss rule and attorney immunity bar the appellants from any recovery against him, and that the verdict against him should be set aside due to improper jury argument by opposing counsel. We conclude that the evidence is legally sufficient to support the jury's fraud finding, and the arguments presented in the attorney's cross-points do not vitiate the verdict. We therefore reverse the judgment as to that defendant and remand for rendition of judgment consistent with this opinion.[1]

## I. FACTUAL AND PROCEDURAL BACKGROUND

In early 2009, three hospitals—one in Dallas, one in Houston, and one in Groves—were among the assets of a hospital system in bankruptcy. The hospitals formed part of the collateral for a debt owed to First National Bank ("the Bank"). Greg Walker, Kailee Wong, and their associates were interested in purchasing the hospitals, but before that was arranged, the hospitals were essentially emptied of patients. At the beginning of March 2009, the Bank's branch president Linda Burley and its outside counsel, appellee Greg Yollick, negotiated a term sheet with Walker and Wong for a group of investors to purchase the hospitals. The Bank dictated the structure of the transaction, and the bankruptcy court approved it. The parties agreed that a group of six limited-liability companies—appellants BD Texas, LLC; JJJJ Walker, LLC; Renaissance Properties of Texas, LLC; Priya Properties, LLC; Dynafab USA, LLC; and KW Hospital Acquisition, LLC (collectively, "the Investors")—would form and own a seventh limited-liability company, and that together, these entities would purchase the hospitals. The seventh limited-liability company, Louisiana Texas Healthcare Management, LLC ("LTHM"), would hold the property through six subsidiary limited-liability companies. Each subsidiary owned either the real estate or the operations of a single hospital. The parties further agreed that Wong would be a direct or indirect principal of LTHM. The Bank was to provide the funds for the purchase and for initial

---

[1] The appellants have asked that the case be remanded for the trial court to render judgment rather than that this court render judgment directly.

working capital.

## A.     The Initial Loan of March 16, 2009

The loan closed on March 16, 2009.  To finance the purchase and provide initial working capital while the hospitals increased their patient populations, LTHM and its subsidiaries ("the LTHM Group") borrowed approximately $37 million from the Bank. Security for the loan included a lien on all accounts receivable; liens on the real property; and the Investors' execution of a pledge agreement granting the Bank a security interest in their ownership interest in LTHM.  Effective as of the date of the closing, the Bank hired Duane Rossmann to act as a "health care consultant" and required the LTHM Group to report to him on the development of the hospitals' business.  Less than thirty days after the closing on the hospital purchase, the Bank and the parties to the loan amended their agreement to make loan payments due quarterly rather than monthly.  The first payment was due on June 15 or June 16, 2009.

## B.     The Letter Agreement of May 14, 2009

In early May 2009, it became apparent to Walker that additional money was needed to make payroll.  The parties negotiated a complicated arrangement requiring the creation of a new entity, Merensky Reef Hospital Corporation ("Merensky Reef"), which would operate under the Bank's control.  Through the execution of a Letter Agreement dated May 14, 2009, the parties agreed as follows:

1.     The parties acknowledged that the LTHM Group needed $2 million to meet accrued payroll obligations that were payable on May 15, 2009.

2.     The Bank would loan the money ("the bridge loan") to Merensky Reef for thirty days from the first date that the funds were advanced ("the forbearance period").

3.     The Investors would continue attempting to raise additional funding, and the LTHM Group could grant second liens on their property to secure such funding.

4.     The parties would enter into "Transfer Documents" that (a) gave the Bank an assignment of the Investors' membership interests in LTHM to Merensky Reef; and (b) mutually released all claims between and among the Investors and the

3

Bank relating to the LTHM Group and the obligations of the LTHM Group and the Investors to the Bank, except for the obligations under the Loan Agreement of March 16, 2009.

5. Merensky Reef would hold the Transfer Documents in trust, but would have the exclusive right to vote the Investors' membership interests in LTHM during the forbearance period. If the bridge loan were not repaid during the forbearance period, then Merensky Reef would continue to have the right to vote the Investors' membership interests in LTHM. If the bridge loan were timely repaid, then the Transfer Documents would be deemed extinguished.

6. During the forbearance period, (a) the LTHM Group would take no action resulting "in a material adverse effect upon the LTHM Group's value, operations, assets, members, governance or liabilities," and (b) the Bank and the LTHM Group would coordinate with the Investors in efforts to market the hospitals and their operations.

7. If the LTHM Group did not repay the bridge loan within the forbearance period and the Bank elected to release the Transfer Documents, then LTHM's members would use "commercially reasonable efforts to effectuate the orderly transition of the LTHM Group's operations" to the Bank or to the Bank's assignee or designee.

8. During the forbearance period, the Investors' prior approval would be required for any proposed business expenditure outside the ordinary course of business in excess of $20,000.

## C. Merensky Reef's Actions

On May 14, 2009—the same date as the Letter Agreement—Yollick formed Merensky Reef. Yollick also asked his wife, his longtime friend Jim Jenkins, and Duane Rossmann to serve as Merensky Reef's board of directors, and all three agreed.

According to Merensky Reef's minutes and the evidence at trial, Merensky Reef held three meetings at Yollick's office that day. At 7:00 p.m., Merensky Reef's initial director Jenkins elected Rossmann as Merensky Reef's president and secretary and issued all of the corporation's shares to Mara Drake as trustee of the Witwatersrand Trust. Mara Drake's legal name is Tamara Yollick; she is Yollick's wife. She testified that Yollick asked her to identify herself as Mara Drake in connection with Merensky Reef and the Witwatersrand Trust, but he did not tell her why. At 7:05 p.m., Jenkins,

4

Rossmann, and Drake were elected to Merensky Reef's board of directors. As relevant here, Merensky Reef voted at 7:15 p.m. as follows:

1. "[Merensky Reef] approves the execution of any and all necessary loan documents between [it] and [the Bank] for the purpose of the purchase of the [hospitals] and [to] obtain appropriate working capital facility."

2. "[Merensky Reef] shall enter into the May 14, 2009 letter agreement" between it, LTHM, LTHM's members, and the Bank.

3. It also "shall enter into a loan facility to purchase the [h]ospitals and LTHM under the terms and conditions of the term sheet annexed hereto . . . , under the terms of assumption of the obligations of LTHM under the Loan Agreement dated March 16, 2009, as amended . . . , and under the terms of assumption of additional indebtedness in the amount of approximately $5.2 million of debt . . . ."

The $5.2 million debt referenced above had been owed to the Bank by a previous owner of the hospitals, but that debt had not been assumed by the Investors or the LTHM Group when the hospitals were purchased out of bankruptcy, and the Bank had already charged it off.

Bank documents dated May 15, 2009 show that on that day, Linda Burley completed a request for the Bank to loan Merensky Reef $3.5 million for working capital.[2] In addition, Merensky Reef assumed all obligations under the March 16, 2009 Deeds of Trust, together with $5,297,950 in previously charged-off debt. Merensky Reef secured the debts with liens against the LTHM Group's property. The Bank documents state that these debts were assumed "[t]o finance the purchase of the three [hospitals]." The Investors were not informed of the transactions.

One week later, Rossmann signed a "unanimous consent in lieu of meeting" of LTHM. Merensky Reef was identified as LTHM's sole member; Merensky Reef's sole shareholder was Drake as trustee of the Witwatersrand Trust; and the trust's sole beneficiary was Rossmann. In the consent document, Rossmann elected himself as

---

[2] Although the figure in the Letter Agreement was $2 million, Walker testified that a total of $3.5 million was needed to cover payroll through the end of the forbearance period.

LTHM's sole manager, corporate officer, chairman of the board, president, and secretary, and he specified that LTHM's attorneys would report solely to him and take no action without his express authority. He also removed all existing officers of LTHM's subsidiaries and replaced every subsidiary's officers with himself as sole officer, manager, president, secretary, and chief executive officer.

On June 12, 2009, the loan agreement between Merensky Reef and the Bank was amended, increasing the debt secured by the hospitals still further by raising the amount of working capital borrowed by Merensky Reef to $4,587,000. Once again, the Investors were not informed.

Between August and October 2009, the Bank sold the three hospitals for approximately $55.4 million. LTHM paid Drake and Jenkins $10,000 each for their service on Merensky Reef's board of directors. Although the Bank had been paying Rossmann $750 per day as a consultant before the parties entered the Letter Agreement, LTHM had paid those bills for the thirty days after the Letter Agreement, then hired him directly as a full-time employee. The Investors were paid nothing.

## D. Trial

The Investors sued Merensky Reef, the Bank, LTHM, Yollick's law firm, and Yollick. Some claims were dismissed or nonsuited, and a unanimous jury found that (1) Merensky Reef breached its fiduciary duty to the Investors; (2) both Merensky Reef and the Bank failed to comply with the Letter Agreement; and (3) Merensky Reef, the Bank, and Yollick committed fraud and converted the Investors' membership interests in LTHM. As to each liability theory, the jury found that the Investors sustained actual damages of over $19 million; that the Bank was 80% responsible for each Investors' actual damages; and that Merensky Reef and Yollick were each 10% responsible. In connection with the fraud claims, the jury also assessed punitive damages of $45.6 million against the Bank, and $5.7 million each against Merensky Reef and Yollick.

Yollick moved for judgment notwithstanding the verdict ("JNOV"), and the trial court granted it on the grounds that there was "no evidence to support the jury's findings on the issues of . . . individual liability for Eric Yollick, and conversion . . . ." The trial court denied the portion of the motion in which Yollick sought JNOV on the grounds of attorney immunity, the economic-loss rule, and improper closing arguments.[3] The trial court also denied the portion of the motion in which all of the defendants sought JNOV on the ground that there was no evidence of actual damages, and in which they argued that there was no evidence of malice to support the award of punitive damages.

The Investors appealed. Merensky Reef and the Bank settled with the Investors while the appeal was pending, and at the Investors' request, we dismissed all defendants other than Yollick from this appeal.

## II. ISSUES PRESENTED

In the Investors' sole issue, they contend that the trial court erred in granting Yollick's motion for JNOV and entering a judgment that the Investors take nothing on their claims against him. The Investors do not challenge the portion of the order in which the trial court granted JNOV as to the conversion claim against Yollick; they challenge the JNOV only to the extent that the trial court disregarded findings that ultimately were predicated on a finding that Yollick committed fraud.

The trial court granted the JNOV motion on the ground that there was no evidence of Yollick's individual liability, and "[w]hen a trial court specifies the ground or grounds upon which it grants a JNOV, an appellant need only challenge those grounds actually relied upon by the trial court." *Holman St. Baptist Church v. Jefferson*, 317 S.W.3d 540, 547 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). The appellee must bring forward by cross-point any issue or point that would have vitiated the verdict or that would have prevented an affirmance if the trial court had rendered

---

[3] Other grounds addressed in the motion do not pertain to Yollick.

7

judgment on the verdict. TEX. R. CIV. P. 324(c); TEX. R. APP. P. 38.2(b)(1). We will consider such cross-points, even when the appellee does not explicitly refer to them as such. *See Holman St. Baptist Church*, 317 S.W.3d at 547 ("Although Jefferson did not explicitly term his . . . arguments as 'cross-points,' he did make such arguments in response to [appellant's] issues. We will therefore consider these arguments as cross-points and assess the merits of Jefferson's contentions.").

Here, Yollick did not expressly raise any cross-points; however, the Investors' opening brief addressed some of the alternative grounds on which Yollick requested JNOV, and Yollick made responsive arguments in his brief. We will therefore treat those arguments regarding liability as cross-points.

### III. ANALYSIS

We review a judgment notwithstanding the verdict for legal sufficiency of the evidence. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We "'credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not.'" *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009) (quoting *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007)). We will uphold the jury's finding on issues necessary to liability if they are supported by more than a scintilla of competent evidence. *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003) (per curiam). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."

### A. The trial court erred in granting the JNOV on the ground that there was no evidence of fraud.

The jury was charged that fraud occurs (1) when a party makes a material misrepresentation, and (2) the misrepresentation is known to be false or that is made recklessly without knowledge of its truth or falsity and as a positive assertion, and (3) the misrepresentation is made with the intention that the other party should act on it, and

8

(4) the other party does rely on the misrepresentation and thereby suffers injury. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990) (op. on reh'g). "Misrepresentation" was defined in the charge to include "[a] promise of future performance made with an intent, at the time the promise was made, not to perform as promised." The jury was further instructed that "Merensky Reef and Yollick were agents of [the Bank] and acting within the scope of their agency relationship with respect to the matters in this case." We measure the sufficiency of the evidence against these instructions, to which there was no objection. *See Hirschfeld Steel Co. v. Kellogg Brown & Root, Inc.*, 201 S.W.3d 272, 283–84 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

In his JNOV motion, Yollick argued there was no evidence that (1) he made any representations related to the Letter Agreement; (2) any representations he made were false; (3) he knew any such representation was false; and (4) Investors Renaissance, Dynafab, and BD Texas relied on any misrepresentation. We conclude that legally sufficient evidence supports the jury's fraud finding, and thus, the trial court erred in granting the JNOV on the no-evidence ground asserted.

### 1. *Yollick represented that the Bank intended to abide by the Letter Agreement.*

The evidence establishes that Yollick made a material representation concerning the Letter Agreement. In arguing to the contrary, Yollick assumes that a representation must be a statement outside the contract itself, but this is not the case. By entering into a contract, a corporate party represents that it intends to be bound by the contract's terms. *See Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48–49 (Tex. 1998) (sub. op.) (evidence that a corporate party entered into a contract supports the fraud element that the party represented that it intended to abide by the contract's terms). Corporations can act only through individuals. *Chon Tri v. J.T.T.*, 162 S.W.3d 552, 562 (Tex. 2005). Thus, the individual who signs a contract as the

9

corporation's agent represents that the corporation intends to perform the contract. Here, that representation was made by Yollick, who admittedly signed the Letter Agreement as the Bank's agent. By doing so, Yollick made the material representation that the Bank intended to abide by its terms. As discussed further below, however, the evidence of the Bank's actions, whether performed directly by Bank employees or through Yollick and Merensky Reef as the Bank's agents, supports the jury's finding that the Bank failed to comply with the Letter Agreement and never intended to do so.

### 2. There is legally sufficient evidence that the representation was false because the Bank never intended to comply with the agreement's terms.

Direct proof of intent to defraud is rare, but breach of the contract coupled with slight circumstantial evidence of fraud is sufficient to support a fraud finding. *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 775 (Tex. 2009) (per curiam); *see also Gotham Ins. Co. v. Warren E & P, Inc.*, 57 Tex. Sup. Ct. J. 336, 2014 WL 1190049, at *5 n.15 (Tex. Mar. 21, 2014) ("Regarding whether the representation was fraudulent, this is an inquiry typically left to the jury as it often involves proof of intent by circumstantial evidence." (citing *Quinn v. Dupree*, 157 Tex. 441, 303 S.W.2d 769, 774 (1957) (per curiam))). Although intent is determined at the time the representation is made, it may be inferred from the party's subsequent acts. *Aquaplex*, 297 S.W.3d at 775; *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). Here, evidence of the actions taken by the Bank and its agents on the date of the Letter Agreement and immediately thereafter is legally sufficient to support the finding that the Bank never intended to comply with the agreement's terms. In the following examples, we include acts by Merensky Reef, because as the Bank branch president testified, it was no secret that Merensky Reef "was always completely under the control" of the Bank. The jury also was instructed that in the matters in this case, Merensky Reef was acting within the scope of its agency relationship with the Bank.

First, Merensky Reef immediately disregarded the requirement to hold the

10

Investors' membership interests in LTHM in trust, and instead acted from the outset as LTHM's sole owner with the right to control the sale of the hospitals. Although the hospitals were owned by LTHM's subsidiaries, Merensky Reef passed a resolution on the day the Letter Agreement was drafted to purchase the hospitals, and on the next day, Merensky Reef and the Bank signed documents putting that plan into effect without consulting the Investors. The jury reasonably could conclude from this conduct that the Bank never intended to comply with the Letter Agreement's requirement to hold the Investors' membership interests in trust during the forbearance period and to coordinate any attempts to market the hospitals. The jury additionally could infer that the Bank never intended to comply with the prohibition against taking actions having a material adverse effect on the LTHM Group's members.

Second, Merensky Reef immediately caused the LTHM Group to assume millions of dollars of debt that the Bank had already charged off—even though no officer, director, board member, or shareholder of any company in LTHM Group could identify any business purpose for LTHM Group to do so. Moreover, Merensky Reef secured that needless debt with a lien in the Bank's favor on the LTHM Group's property. Neither the Bank nor Merensky Reef informed the Investors of these actions. Reasonable jurors could conclude from this evidence that the Bank never intended to comply with the prohibition against taking any action resulting in a material adverse effect upon LTHM Group's value, assets, or liabilities, or with the requirement to obtain the Investors' prior approval for any proposed business expenditure outside the ordinary course of business in excess of $20,000.

Third, within a week of the Letter Agreement, the Bank's agents caused the LTHM Group to oust all of its previous board members and corporate officers who were not answerable to the Bank, replacing them with a single person—Duane Rossmann—who did as the Bank instructed him. Specifically, he admitted that because the Bank's branch president "controlled the purse strings," he "took her advice." The jury

11

reasonably could conclude from this that the Bank never intended to comply with the agreement's prohibition against taking actions having a material adverse effect on the LTHM Group's governance.

3.    *There is legally sufficient evidence that Yollick knew the representation was false.*

There also is legally sufficient evidence that Yollick knew the Bank never intended to comply with the Letter Agreement's terms. As with intent, knowledge of falsity can be proved with circumstantial evidence. *See Johnson & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 526 (Tex. 1998) (sub. op.). And here, there is evidence that when Yollick represented that the Bank intended to perform, he knew that this was false because he already had witnessed Merensky Reef approving the plans to violate the agreement. Specifically, the record contains more than a scintilla of evidence that (a) Yollick and the Bank knew the terms of the Letter Agreement before Merensky Reef's board meeting on May 14, 2009; (b) at the same meeting, the board resolved both to execute the agreement and to take actions prohibited by the agreement; (c) Yollick was aware of these actions because they were performed in his presence and at his direction; and (d) Yollick did not represent that the Bank intended to comply with the agreement until after he had seen that these resolutions were passed.

First, the record shows that Yollick, the Bank, and Merensky Reef all were aware of the proposed Letter Agreement's terms by the time of that board meeting. The Letter Agreement shows on its face that LTHM's attorney emailed the proposal to Yollick for the Bank's approval on May 14, 2009, and Merensky Reef voted at 7:15 p.m. to execute the agreement; thus, the jury could infer that Yollick and Merensky Reef had read the Letter Agreement by that time. The jury was instructed that both Yollick and Merensky Reef were the Bank's agents, and an agent's knowledge is imputed to its principal. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 924 (Tex. 2010).

Second, the board's minutes show that in the course of a single meeting,

Merensky Reef voted both to execute the Letter Agreement and to take actions that would materially breach it. As previously mentioned, those included plans to (a) execute loan documents for Merensky Reef to purchase the hospitals, even though there had been no coordination of marketing efforts as required; and (b) decrease the LTHM Group's value, encumber its assets, and increase its liabilities by forcing it to assume approximately $5.2 million of needless debt.

Third, there is more than a scintilla of evidence that Yollick witnessed the board's actions and even directed them. The address at which the meetings were held is identified in the minutes, and witnesses testified that the meetings were held at Yollick's office and that the address was that of his law firm. Jenkins further testified that Yollick was present at the meetings and prepared the minutes. Both Jenkins and Drake testified that they acted in reliance on Yollick's instructions.

Fourth, there is evidence that Yollick, in his capacity as the Bank's agent, did not sign and return the proposed Letter Agreement until at least the day after the board passed these resolutions. The Letter Agreement stated that if the Bank accepted the agreement, Yollick was to indicate that by signing it. *See Advantage Physical Therapy, Inc. v. Cruse*, 165 S.W.3d 21, 25–26 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (explaining that to form a binding contract, the offer must be accepted in compliance with its terms, and the acceptance must be communicated). The evidence supports an inference that Yollick did not sign and return the agreement on May 14, 2009, because at 12:08 a.m. on May 15, 2009, LTHM's attorney wrote in an email to Yollick, "Please advise when you anticipate obtaining final approval from your side and on getting us the signature pages for [the Bank] and [Merensky Reef]." By that time, Yollick would have known that the Bank did not intend to perform the agreement, because he already had seen the board approve the plans to violate it. The Letter Agreement bearing his signature is evidence that despite this knowledge, he nevertheless represented that the Bank intended to be bound by the agreement.

Viewed in the light most favorable to the jury's finding, the evidence is more than sufficient to show that when Yollick represented that the Bank intended to comply with the Letter Agreement, he knew that the representation was false. *See Formosa Plastics*, 960 S.W.2d at 48 (evidence supported fraud finding where the contract provided that the plaintiff would control materials delivery and defendant decided before the contract was signed to take over materials delivery without informing the plaintiff).

### 4. *There is legally sufficient evidence that all of the Investors relied on the false representation.*

Yollick contends because the principals of three of the Investors did not testify at trial, there is no evidence that those Investors relied on any statement by him; however, one witness testified about all of the Investors' reliance. Kailee Wong was asked, "In the term sheet of May 14, 2009, what did you and the other plaintiffs -- did you rely upon the defendants to follow their -- the words that were set forth in that agreement?" He answered, "Yeah, we did. That's the whole reason why we went into it. If you're going to go into an agreement in good faith, it's just -- that's how we operated and that's what we were trying to do." His testimony is some evidence that all of the Investors relied on Yollick's representation.

We conclude that the trial court erred in granting Yollick's JNOV motion on the ground that there was no evidence to support the jury's finding on the issue of Yollick's individual liability. We turn now to Yollick's points asserting alternative grounds that he contends vitiate the verdict.

## B. Yollick's challenge to the jury's compensatory-damages finding lacks merit.

Yollick makes several arguments about the Investors' damages under the broad heading "appellants' only evidence of damages reflects the value of the hospitals for which they were not permitted to sue."[4] Several of these arguments overlap and contain

___

[4] Capitalization normalized.

erroneous assertions of fact. To avoid adding to the confusion, we will summarize the evidence shown by the relevant parts of the record before addressing Yollick's arguments based on his characterization of the same material.

The jury was instructed to measure the actual damages from the defendants' fraud as "[t]he value of each Plaintiff's membership interests in LTHM as of May 15, 2009." The jury assessed damages totaling $19,106,300. This figure is exactly equal to the difference between two numbers on the Bank's document approving Merensky Reef's loan application of May 15, 2009. The document was prepared by Bank president Linda Burley. She noted that the loan would be secured by a lien "on all assets of LTHM on Houston, Dallas, and Groves," and that the lien would be inferior to the lien in the amount of $37,041,398 that the Bank already had taken on those assets. The earlier lien secured the loan that the Bank had made to the LTHM Group sixty days earlier. Burley identified the collateral to include not only the medical facilities—that is, the real property consisting of the three hospitals—but also the commercial accounts and commercial equipment. She stated on the form that the collateral's value was $56,147,698. The total collateral value listed on this form was the same as the total collateral value identified on the Bank's loan documents in connection with the LTHM Group's purchase of all of the Group's assets sixty days earlier. The loan documents on both dates also identified the same sources for that figure: "Appraisal" and "FF&E Evaluation."[5]

The Investors' expert Gilbert Herrera testified that the value of the membership interests on May 15, 2009 could be determined by taking the value of the collateral as stated on this form and subtracting the amount of the Bank's lien. He further stated that he reviewed the appraisals and evaluations on which the Bank's "principal valuation"

---

[5] Burley explained the meaning of these terms in her testimony. She stated that she hired a third-party real estate appraiser who appraised the hospitals in March 2009, and that the "FF&E Evaluation" concerned the value of "furniture, fixtures, and equipment."

15

was based, and that these supported the numbers on the form. LTHM's subsidiaries or the subsidiaries' assets were sold for a total of about $55.4 million on dates between three-and-one-half and five-and-one-half months after May 15, 2009, and Herrera testified that these sales prices confirmed the accuracy of the valuation on May 15, 2009.

### 1.  The Investors' evidence addressed the value of their membership interests, not just the value of the hospitals.

Yollick first argues that the Investors' "only evidence of damages reflects the value of the hospitals for which [the Investors] were not permitted to sue." He contends that the Investors "valued the hospitals, not the LTHM membership interests, in violation of the trial court's Order on the lack of standing."[6] Yollick did not specifically state whether he was challenging the Investors' standing to recover the damages assessed by the jury or whether there is legally insufficient evidence of those damages; however, we recently addressed an analogous argument in *Starkey v. Graves*, Nos. 14-12-00633-CV and 14-12-00709-CV, 2014 WL 4459113 (Tex. App.—Houston [14th Dist.] Sept. 11, 2014, no pet. h.). We follow the same reasoning here.

In *Starkey*, a limited partner successfully sued the other individuals and companies involved in a limited partnership. On appeal, the defendants argued that the plaintiff lacked standing because the suit "involve[d] claims owned and damages suffered by the partnership rather than by the [plaintiff] individually." *Id.*, 2014 WL 4459113, at *5. We noted that the jury was told to assess damages measured by the amount of the plaintiff's past out-of-pocket losses, but "received no instructions as to how these were to be measured; thus, jurors were permitted to assess these damages based on injuries sustained by [the plaintiff] individually." *Id.*, 2014 WL 4459113, at

---

[6] Yollick based this argument on the Investors' pre-trial attempt to assert derivative claims on LTHM's behalf for the loss of the hospitals. The trial court ruled that the Investors "do not have standing to assert derivative claims" and dismissed their "claims for injuries suffered by the corporation."

16

*6. The defendants neither requested an instruction about how to determine the amount of such damages, nor objected to the absence of such an instruction. *Id.*, 2014 WL 4459113, at *14. We therefore concluded that "[t]he question of whether there is any evidence that [the plaintiff] personally was injured is a question of sufficiency of the evidence, not a question of standing." *Id.*, 2014 WL 4459113, at *6. Because there was evidence that the defendants caused the plaintiff to lose a 19% interest in the limited partnership and that the interest had financial value, we held that there was legally sufficient evidence that the plaintiff personally was damaged. *Id.*, 2014 WL 4459113, at *16.

Here, the jury was told to assess damages measured by "[t]he value of each Plaintiffs' membership interests in LTHM as of May 15, 2009." As in *Starkey*, the jury was not told how to determine this amount, and Yollick neither requested such an instruction nor objected to its absence. Just as the plaintiff in *Starkey* had standing to recover the value of his lost partnership interest, the Investors here have standing to recover the value of their lost membership interests. We therefore treat this argument as a challenge to the legal sufficiency of the evidence.

Contrary to Yollick's characterization of the record, the damages evidence is not limited to evidence about the hospitals' value, but includes more than a scintilla of evidence about the value of the membership interests. As Herrera explained, LTHM was a special-purpose entity "set up for the purpose of basically holding the ownership of the real estate and the operating entities in these three hospitals." The value of the hospitals naturally affects the value of the LTHM membership interests because LTHM's members owned LTHM; LTHM owned six subsidiaries; and three of those subsidiaries owned the hospitals. Thus, the value of the membership interests includes—but is not limited to—the value of the hospitals.

In a subsidiary argument, Yollick contends that Herrera's testimony was based on the theory that the LTHM membership interests were collateral for the Bank's loans, but

that the "[Bank's] appraisals show that the collateral *was the three hospitals, not the membership interests*." (emphasis in original). Stated differently, he contends that Herrera reached his conclusions about the value of the membership interests by assuming the existence of facts contrary to those shown by the evidence. We test this contention using the legal-sufficiency standard of review. *See Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 637, 638 (Tex. 2009) (explaining that an expert's opinion is unreliable "if it is based on assumed facts that vary from the actual facts" and that such opinion testimony's "unreliability makes it legally insufficient to support a verdict").

In support of this assertion, Yollick cites two exhibits, neither of which is an appraisal, and each of which shows that the collateral was not limited to the hospitals.

The first exhibit Yollick cites is the March 2009 loan request by the LTHM subsidiary that owned the real property in Groves. In the section of the application for "Loan Officer comments on collateral and loan to value," Bank president Linda Burley wrote, "[W]e also have the pledge of ownership of the units of the parent company [LTHM]. This loan will be cross-collateralized with all other loans extended to LTHM et all [sic] on all of their assets at Houston, Groves and Dallas hospital facilities." In testifying about the reference to cross-collateralization in this document, Burley was asked the following:

> Q:    And in doing that, did you believe that the bank was protecting itself on each individual loan by being able to rely on all of the collateral?
> A:    Yes, sir.
> Q:    All three hospitals and all of the member interests in LTHM?
> A:    Yes, we did.

Although the value of the collateral was redacted from this particular exhibit, it is undisputed that the value assigned by the Bank to all of these cross-collateralized assets was $56,147,698.

Yollick also relies on the previously discussed document in which the Bank

approved Merensky Reef's loan request of May 15, 2009. In that document, the "collateral value" was not redacted, and is stated to be $56,147,698. In both documents, the collateral included all of LTHM's assets—not just the hospitals—and in both documents, the Bank noted the amount of the lien on those assets. Thus, the record contradicts the premise on which this argument is based.

## 2. *Herrera did not appraise real property.*

Yollick next asserts that Herrera valued the hospitals as real estate, but lacked the qualifications to value real property and valued the property as of the wrong date. In support of this argument, Yollick again cites the same two loan documents prepared by the Bank, but this time, he refers to them as "Herrera's appraisal[s]." Moreover, he admits in a footnote that one of these two "appraisals [sic] *was from the correct date—* May 15, 2009—but it, too valued the hospitals and not the interests." (emphasis added).

It is not clear whether these arguments are intended to be a restatement of Yollick's arguments about the legal sufficiency of the damages evidence or a separate complaint about Herrera's qualifications to appraise real estate, but in any event, they present nothing for our review. The arguments are based on the mistaken premise that Herrera appraised or valued the hospitals as real estate rather than valuing the Investors' membership interests in LTHM as of May 15, 2009. Not only is there is no such evidence in the record, but Yollick's characterization of the evidence on appeal is directly contradicted by the evidence he himself elicited from Herrera at trial:

> Q: Mr. Herrera, what you have done, though, for this Court and for the jury is you provided us a valuation not of the hospitals themselves but of the ownership interests in the company that owned the hospitals, right?
>
> A: Amongst other things, on May 15, which is, I think, what we were asked to do, establish a value of the—of the membership interests, yes, sir, and to then provide a value, or damages, as relates to the conduct here.
>
> . . . .
>
> Q: But for May of 2009, sir, you're not providing us a valuation of the

19

actual hospitals on that date, correct?

A:    No, sir.

Once again, the record contradicts the premise on which Yollick's argument is based.

### 3.    *Yollick waived his complaints that jurors should not or could not use a particular method to calculate "value."*

Yollick argues that the jury was not permitted to calculate the fair market value of the Investors' membership interests by subtracting LTHM Group's liabilities from its assets, because that method could be used only if there was no market for the membership interests, and the evidence established that there was a market in which the interests' value was zero.   He argues in the alternative that even if the jury were permitted to calculate the membership interests' fair market value as the difference between LTHM Group's assets and its liabilities, jurors could not do so because there was no evidence the size of its debts.

The Investors assert that Yollick waived any argument that the value of their membership interests had to be based on fair market value.  They point out that jurors were not asked to find the "fair market value" of the membership interests on May 15, 2009; they were asked to find the interests' "value" as of that date, without the benefit of any definition of the term "value" or any instructions about how to calculate it.  The Investors also correctly point out that Yollick neither objected to the omission nor requested any definitions or instructions.

We agree that under these circumstances, we must measure the sufficiency of the evidence by the charge that was given.  *See Romero v. KPH Consolidation, Inc*., 166 S.W.3d 212, 221 & n.30 (Tex. 2005).  Measured by that standard, the evidence is legally sufficient.  As previously discussed, Herrera testified that on May 15, 2009, the Bank had a lien in the amount of $37,041,398 on LTHM Group's assets, and that the value of the Investors' membership interests was equal to the value of the Group's

assets minus the amount of the lien. This is supported by the evidence, and in the absence of a definition or instruction requiring them to use some other method to calculate the "value" of the membership interests, jurors were free to use the same figures. *See Liberty Sign Co. v. Arendale*, 433 S.W.2d 23, 26–27 (Tex. Civ. App.—Fort Worth 1968, no writ) (appellant waived complaint about the method used by jurors to calculate "reasonable cash market value" where appellant neither requested any definition or instruction about how it was to be calculated nor objected to the absence of any definition or instruction, and the only number jurors used that was not supported by the evidence benefitted the appellant).[7]

## C. Yollick failed to conclusively establish that the economic-loss rule bars the Investors from recovering on their claim against him.

In his appellate brief, Yollick argues that because there is no evidence of fraud, the claims against him must sound in contract. His only mention of the economic-loss rule is found in the heading, "Because the claims in this case sound in contract, the economic[-]loss rule precludes any recovery against Yollick."[8] As previously discussed, however, there is evidence of fraud, a cause of action for which purely economic losses are recoverable. *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 418–19 (Tex. 2011); *see also Formosa Plastics*, 960 S.W.2d at 47 ("[T]ort damages are recoverable for a fraudulent[-]inducement claim irrespective of

---

[7] Because the jury was not asked to find the "fair market value" of the membership interests, Yollick's arguments about the way fair market value should be calculated are waived, but they also are not supported by the record. Yollick argues that fair market value can be calculated as the value of a company's assets minus its liabilities, but that this method can be used only if there is no evidence of the amount that a willing purchaser would pay to a willing seller under no compulsion to sell. He asserts that there is such evidence here. According to Yollick, the Investors tried and failed to sell their membership interests, thereby establishing that there was a market for the interests in which the value of the interests is zero. There is no evidence, however, that anyone would have been willing to sell a membership interest for zero dollars. He argues in the alternative that even if jurors were permitted to calculate fair market value as the difference between assets and liabilities, jurors were not given "a debt number or a method of calculating the debt." This, too, is incorrect, because as we have seen, Herrera testified about the indebtedness to the Bank.

[8] Capitalization normalized.

whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract."). We accordingly reject this argument as an alternative basis for judgment notwithstanding the verdict.

**D.    Yollick failed to conclusively establish that he is immune from liability for the Investors' claims.**

Yollick additionally argues that he is entitled to attorney immunity. Immunity is an affirmative defense. *City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011) (addressing immunity generally); *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 381 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (addressing attorney immunity specifically). Yollick therefore bore the burden to establish his entitlement to immunity.

Yollick says that he is entitled to attorney immunity as a matter of law because the Investors stipulated that he never represented them but at all times represented the Bank and/or Merensky Reef. That fact is insufficient to establish immunity, because it is well established that an attorney can be held liable for his own fraudulent conduct even though it was performed on a client's behalf. *See Chu v. Chong Hui Hong*, 249 S.W.3d 441, 446–47 (Tex. 2008) ("An attorney who personally . . . tells lies on a client's behalf may be liable for . . . fraud in some cases."); *Poole v. Hous. & T.C. Ry. Co.*, 58 Tex. 134, 137–38 (1882) (holding that an attorney cannot "shield himself from liability on the ground that he was the agent of [his client], for no one is justified on that ground in knowingly committing wilful and premeditated frauds for another"); *James v. Easton*, 368 S.W.3d 799, 803 (Tex. App.—Houston [14th Dist.] 2012, pet. denied) ("[I]f an attorney engages in fraudulent or malicious conduct in the course of representing his client, an opposing party may assert intentional tort claims against the attorney based upon this conduct."); *Alpert v. Crain, Caton & James, P.C.*, 178 S.W.3d 398, 406 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) ("A lawyer thus cannot shield his own willful and premeditated fraudulent actions from liability simply on the ground that he is

22

an agent of his client."); *see also Essex Crane Rental*, 371 S.W.3d at 381 (noting—as we have just done—that in *Chu*, the Texas Supreme Court "did not hold that attorneys are immune to suit for fraudulent acts undertaken in the representation of a client; it indicated exactly the opposite").

In arguing to the contrary, Yollick relies on statements by courts in the course of explaining that an attorney is not liable to a non-client for (1) professional negligence in rendering legal services or (2) statements made in the course of representing the non-client's opponent in adversarial proceedings. Both of those circumstances are distinguishable from the facts presented here.

In the first category of authority, Yollick relies on language used by the authoring court in explaining that an attorney generally does not independently owe a non-client a duty of care in the provision of legal services.[9] For this reason, an attorney ordinarily is

---

[9] *See, e.g.*, *Chu*, 249 S.W.3d at 446 n.18 ("At common law, an attorney owes a duty of care only to his or her client, not to third parties who may have been damaged by the attorney's negligent representation of the client." (quoting *Barcelo v. Elliott*, 923 S.W.2d 575, 577 (Tex. 1996))); *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 792 (Tex. 1999) ("The general rule is that persons who are not in privity with the attorney cannot sue the attorney for legal malpractice."); *Vinson & Elkins v. Moran*, 946 S.W.2d 381, 401 (Tex. App.—Houston [14th Dist.] 1997, writ dism'd) ("Texas law does not recognize a cause of action for negligence against an attorney asserted by one not in privity with that attorney. . . . The courts of this state have uniformly applied the privity barrier in the estate planning context."); *White v. Bayless*, 32 S.W.3d 271, 276 (Tex. App.—San Antonio 2000, pet. denied) (holding that opposing counsel "cannot be held liable for wrongful litigation conduct" because they owed no duty to the opposing party); *Renfroe v. Jones & Assocs.*, 947 S.W.2d 285, 287 (Tex. App.—Fort Worth 1997, writ denied) ("An attorney's duties that arise from the attorney-client relationship are owed only to the client, not to third persons, such as adverse parties."); *Bradt v. West*, 892 S.W.2d 56, 71–72 (Tex. App.—Houston [1st Dist.] 1994, writ denied) ("[A]n attorney does not have a right of recovery, under any cause of action, against another attorney arising from conduct the second attorney engaged in as part of the discharge of his duties in representing a party in a lawsuit in which the first attorney also represented a party."); *Maynard v. Caballero*, 752 S.W.2d 719, 721 (Tex. App.—El Paso 1988, writ denied) (holding that the defendant attorney owed a duty to his own client, but owed no duty to his client's co-defendant); *Likover v. Sunflower Terrace II, Ltd.*, 696 S.W.2d 468, 472 (Tex. App.—Houston [1st Dist.] 1985, no writ) ("An attorney has no general duty to the opposing party, but he is liable for injuries to third parties when his conduct is fraudulent or malicious. He is not liable for breach of a duty to the third party, but he is liable for fraud."); *Morris v. Bailey*, 398 S.W.2d 946, 948 (Tex. Civ. App.—Austin 1966, writ ref'd n.r.e.) (explaining that opposing counsel had a right to move for a continuance on his client's behalf and violated no duty to non-client by doing so).

23

not liable to a non-client for legal malpractice. The Investors, however, have not sought to hold Yollick liable for malpractice. They instead alleged—and the jury agreed—that Yollick committed fraud by intentionally or recklessly making a material misrepresentation with the intention that the Investors would rely on it. The jury was instructed that "misrepresentation" can mean "[a] promise of future performance made with an intent, at the time the promise was made, not to perform as promised." There is evidence that Yollick, in his capacity as the Bank's agent, promised that the Bank would perform in accordance with the terms set forth in the Letter Agreement, and that Yollick made the representation knowing that the Bank did not intend to perform as promised. The duty not to intentionally or recklessly make false statements for the purpose of fraudulently inducing another to enter a contract is not a duty of care that is owed only by attorneys in the provision of legal services, nor is it a duty owed only to clients; it is an independent duty that applies to lawyers and non-lawyers alike, and that is owed to non-clients as well as to clients. *See Formosa Plastics*, 960 S.W.2d at 46 ("Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations.").

In the second category of authority, Yollick relies on language used by the authoring court in explaining that a non-client cannot reasonably rely on statements made by opposing counsel in an adversarial context.[10] But in signing the Letter

---

[10] *See, e.g.*, *Bosch v. Armstrong*, No. 01-08-00847-CV, 2009 WL 1635318, at *3–4 (Tex. App.—Houston [1st Dist.] June 11, 2009, pet. denied) (mem. op.) (holding attorney immune from liability to non-client for defamation and negligent or intentional misrepresentations based on statements made in a pre-suit demand letter, pleadings, and an application for a temporary restraining order while representing claimant's opponent); *Dixon Fin. Servs., Ltd. v. Greenberg, Peden, Siegmyer & Oshman, P.C.*, No. 01-06-00696-CV, 2008 WL 746548, at *8–11 (Tex. App.—Houston [1st Dist.] Mar. 20, 2008, pet. denied) (mem. op. on reh'g) (holding attorney immune from liability to non-client for fraud based on the attorney's signing of a verification in support of a petition for a temporary restraining order and his communications with opposing counsel allegedly overstating the amount of stock that was subject to an arbitration award); *Alpert*, 178 S.W.3d at 408 (holding that attorney was not liable to non-client for conspiracy to defraud for filing lawsuits and pleadings and providing legal advice to claimant's opponent); *Chapman Children's Trust v. Porter & Hedges, L.L.P.*, 32 S.W.3d 429, 442 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (holding that law firm was not liable to

Agreement, Yollick was not relying on his professional knowledge and training as an attorney to make a statement in the course of representing his client in an adversarial context; he was simply signing his name, acting as the Bank's agent with actual authority to bind his principal to a promise of future performance. The problem is that he knew the promise was false.

It is well-established that corporate agents are individually liable for fraudulent or tortious acts committed while in the service of their corporation. *See, e.g.*, *Kingston v. Helm*, 82 S.W.3d 755, 759 (Tex. App.—Corpus Christi 2002, pet. denied); *Holberg v. Teal Constr. Co.*, 879 S.W.2d 358, 360 (Tex. App.—Houston [14th Dist.] 1994, no writ); *Guilbeau v. Anderson*, 841 S.W.2d 517, 519 (Tex. App.—Houston [14th Dist.] 1992, no writ); *Grierson v. Parker Energy Partners 1984-I*, 737 S.W.2d 375, 377 (Tex. App.—Houston [14th Dist.] 1987, no writ); *Great Am. Homebuilders, Inc. v. Gerhart*, 708 S.W.2d 8, 10–11 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.); *Barclay v. Johnson*, 686 S.W.2d 334, 336 (Tex. App.—Houston [1st Dist.] 1985, no writ). It is undisputed that Yollick signed the Letter Agreement as the Bank's agent, and the jury was specifically instructed, without objection, that "Merensky Reef and Yollick were agents of [the Bank] and acting within the scope of their agency relationship with respect to the matters in this case." By signing the agreement on the Bank's behalf, Yollick made a material representation that the Bank intended to adhere to its terms. Because he did so knowing that the Bank did not intend to perform as promised, he can be held liable for his conduct, just as any other agent or corporate representative would be. *See Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002) ("[A] corporate agent is personally liable for his own fraudulent or tortious acts."); RESTATEMENT (SECOND) OF AGENCY § 348 (1958) ("An agent who fraudulently makes representations, uses duress, or knowingly assists in the commission of tortious fraud or duress by his principal or by

claimants where "the allegations made by the [claimants] do no more than demonstrate that [opposing counsel] attempted to negotiate a smaller settlement with the [claimants on their clients' behalf").

others is subject to liability in tort to the injured person although the fraud or duress occurs in a transaction on behalf of the principal.") (cited with approval in *Miller*, 90 S.W.3d at 717 n.29); *cf. Duval Cnty. Ranch Co. v. Wooldridge*, 667 S.W.2d 887, 894 (Tex. App.—Austin 1984, writ dism'd w.o.j.) (noting that an agent's false statements of principal's intent to perform were material misrepresentations on which to base a fraudulent-inducement claim). He is not held to a lower standard than any other agent simply because he also happens to be the principal's attorney.

Yollick also contends that an attorney is immune from liability for fraud absent evidence that he sought a personal benefit from the allegedly fraudulent conduct. He has not cited, and we have not found, any authority that supports this proposition, but there is authority to the contrary. In *Poole v. Houston & T.C. Railway Co.*, the Texas Supreme Court addressed an attorney's fraudulent conduct that apparently was performed solely in his client's interest and not on his own behalf. In that case, a merchant discovered that its customer was insolvent and caused the railroad station agent to stop a shipment in transit to the customer. 58 Tex. at 135. When the customer learned of this, it agreed to have the goods shipped back to the merchant, but then assigned its bill of lading to its attorney, J.L. Scott. The attorney intercepted the goods, erased the merchant's name from the shipment, inserted the name of "J.L. Scott & Co.," and reshipped the goods on another bill of lading to the customer's location. *Id.* When the goods arrived, Scott presented the bill of lading and had the goods delivered to his client. *Id.* The evidence recited in the opinion shows only that the attorney acted in his client's interest, not that he acted in his own interest. The court nevertheless stated,

> Having assumed the apparent ownership of the goods, for the purpose and with the intention of consummating the fraud upon appellant [i.e., the merchant], he will not be heard to deny his liability to appellant for the loss sustained by reason of his wrongful acts, under the privileges of an attorney at law, for such acts are entirely foreign to the duties of an attorney; neither will he be permitted, under such circumstances, to shield himself from liability on the ground that he was the agent of the [customer], for no one is

26

justified on that ground in knowingly committing wilful and premeditated frauds for another.

*Id.* at 137–38; *see also Byrd v. Vick, Carney & Smith LLP*, 409 S.W.3d 772, 780–81 (Tex. App.—Fort Worth 2013, pet. filed) ("Although the preparation of a bill of sale to transfer an airplane is not conduct 'foreign to the duties of an attorney,' the intentional and knowing inclusion of false information in a bill of sale to assist a client in avoiding tax liability is."); *Essex Crane Rental Corp.*, 371 S.W.3d at 382 ("Attorneys have no immunity from knowingly drafting fraudulent documents . . . , and they may not deny their liability . . . for the loss sustained by reason of their own wrongful acts on the ground that they are the agents of their clients . . . .").[11]

Yollick further argues that "the attorney must intend an injury from the personal acts" before he will be held liable. Although that is an element of a claim for conspiracy to defraud, it is not an element of the fraud cause of action for which the jury found Yollick liable. *Compare Chu*, 249 S.W.3d at 446 ("Chu could only be liable for conspiracy if he agreed to the *injury* to be accomplished; agreeing to the conduct ultimately resulting in injury is not enough.") *and Chon Tri*, 162 S.W.3d at 556–57 (explaining that "merely proving a joint 'intent to engage in the conduct that resulted in the injury' is not sufficient to establish a cause of action for civil conspiracy," because the conspirators must agree to the intended injury (quoting *Triplex Commc'ns, Inc. v. Riley*, 900 S.W.2d 716, 719 (Tex. 1995))) *with Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 337 (Tex. 2011) (listing elements of a fraud claim).

Yollick additionally contends that a person cannot be held individually liable for

---

[11] Moreover, there is evidence from which a jury could reasonably infer that Yollick sought an indirect personal benefit. The record indicates that he asked his wife to serve on the board of Merensky Reef Hospital Corporation, a corporation controlled by the Bank, and caused LTHM to pay her $10,000 for doing no more than following his instructions. The funds, like all property possessed during a marriage, would be presumed to be community property. *See Barnett v. Barnett*, 67 S.W.3d 107, 111 & n.13 (Tex. 2001) (citing TEX. FAM. CODE ANN. § 3.003(a) (West 2006)).

fraudulent statements made while acting as the agent for a disclosed principal. In support of this argument, Yollick relies on authorities explaining that an agent assumes no contractual liability by entering into a contract for a disclosed principal.[12] The cited cases do not stand for the proposition that an agent who discloses his principal's identity escapes tort liability for his own fraudulent misrepresentations.

We conclude that Yollick failed to establish that he was entitled to judgment notwithstanding the verdict on the alternative ground that he is immune from liability.

**E.**     **Opposing counsel's allegedly improper closing argument regarding a different misrepresentation by a Bank officer does not vitiate the jury's verdict as to Yollick.**

Yollick argues that the trial court properly granted the JNOV because in closing argument during the liability portion of trial, the Investors' counsel stated that in March 2009, the Bank's chief lending officer misrepresented that the Bank would work with the Investors. Yollick points out that during an earlier hearing on a motion for directed verdict, the Investors' attorney told the court that they were not pursuing a fraud claim based on that statement. Yollick now argues that "[t]heir change of position *alone* justifies the JNOV . . . . Appellants' argument created havoc which the trial court resolved by granting the JNOV." We disagree.

---

[12] *See, e.g.*, *Lacquement v. Handy*, 876 S.W.2d 932, 939 (Tex. App.—Fort Worth 1994, no writ) ("[A]s a general rule, if an agent wishes to avoid personal liability on a contract, he has a duty to disclose to the third party, not only the fact he is acting in a representative capacity, but also the *identity* of his principal."); *City of Houston v. First City*, 827 S.W.2d 462, 480 (Tex. App.—Houston [1st Dist.] 1992, writ denied) (holding that defendant principal's attorneys were not liable for the plaintiff's attorney's fees incurred as a result of the principal's breach of contract, and explaining, "This is not a case where an action will lie against an agent because of a wrong for which the agent is personally and independently responsible" (citing *Briggs v. Rodriguez*, 236 S.W.2d 510, 515 (Tex. Civ. App.—San Antonio 1951, writ ref'd n.r.e.))); *Wynne v. Adcock Pipe & Supply*, 761 S.W.2d 67, 68–69 (Tex. App.—San Antonio 1988, writ denied) (holding that individual "contractually obligated himself on the sworn account" by opening the account without disclosing that he was acting as the agent for a corporation); *A to Z Rental Ctr. v. Burris*, 714 S.W.2d 433, 435 (Tex. App.—Austin 1986, writ ref'd n.r.e.) ("Unless the parties have agreed otherwise, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract.").

The jury was asked to make separate findings about the fraud liability of the Bank, Merensky Reef, and Yollick, and it found that all three were liable. The statement about which Yollick complains concerns an alleged misrepresentation by a Bank officer, not by Yollick. If opposing counsel's statement influenced any of the jury's fraud-liability findings, it would have been the finding that the Bank committed fraud, not that Yollick did. We therefore do not address the question of whether there was anything improper about opposing counsel's argument, because in any event, it would not have harmed Yollick. *See* TEX. R. APP. P. 44.1 (a judgment in a civil case may not be reversed for an error of law unless the error probably caused the rendition of an improper judgment or probably prevented the appellant from properly presenting the case on appeal).[13]

## F. The jury's assessment of punitive damages against Yollick is supported by the evidence of Yollick's fraud.

The jury's assessment of punitive damages was predicated on its affirmative answer to the following question: "Do you find by clear and convincing evidence that the harm to Plaintiffs, if any, resulted from malice or fraud?" Yollick argues that the Investors are not entitled to recover punitive damages because (1) there is no evidence of fraud, and (2) no specific finding of malice. As previously explained, however, there is legally sufficient evidence of fraud, and the same evidence that supports the fraud finding by a preponderance of the evidence also supports this finding by clear and convincing evidence. It therefore is unnecessary for us to address Yollick's arguments concerning malice. In a subsidiary argument, Yollick emphasizes that the jury was asked if the harm "to Plaintiffs" resulted from malice or fraud, and was not asked to make a separate finding as to each of the Investors. Because Yollick failed to raise this objection before the charge was submitted to the jury, that complaint has been waived.

---

[13] We note that even an incurably prejudicial jury argument would not support judgment notwithstanding the verdict; the proper remedy would be a new trial. *See Living Ctrs. of Tex., Inc. v. Penalver*, 256 S.W.3d 678, 679 (Tex. 2008) (per curiam).

*See* Tex. R. Civ. P. 274.[14]

## IV. Conclusion

Because there is legally sufficient evidence to support the jury's finding that Yollick committed fraud, the trial court erred in granting the JNOV on this basis. The jury's assessment of actual damages is supported by legally sufficient evidence. The fraud claim is not barred by the economic-loss rule, and attorney immunity does not apply to Yollick's conduct in executing the Letter Agreement as the Bank's agent despite his knowledge that the Bank had no intention of performing. The statement that Yollick treats as an improper jury argument did not harm him because it applied only to a different defendant. Finally, we reject Yollick's challenge to the jury's assessment of exemplary damages because the same evidence that supports the jury's fraud finding supports its finding, by clear and convincing evidence, that the harm to the Investors "resulted from malice or fraud."

We therefore reverse the portion of the judgment in which the trial court ordered "that Plaintiffs shall take nothing on their claims asserted against Defendant Eric Yollick, individually," and we remand the case to the trial court for rendition of judgment consistent with this court's opinion.

/s/    Tracy Christopher
Justice

Panel consists of Justices Boyce, Christopher, and Brown.

---

[14] Because the Investors have asked that the case be remanded for the trial court to render judgment, we do not address, *sua sponte*, any limitations on the recovery of punitive damages.

30